IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
BROOKLYN DIVISION

| | | |
|---|---|---|
| JON BLONDELL, PAUL HARRINGTON, TIMOTHY JOHNSON, STEPHANIE LOWE, F/K/A STEPHANIE MARIE, CHASTITY MARIE, AND CLAYTON PRITCHARD, INDIVIDUALLY AND ON BEHALF OF A CLASS OF SIMILARLY SITUATED PERSONS, | § § § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. _1:17-cv-00372_____ |
| BRUCE BOUTON, DUNCAN CRABTREE-IRELAND, AUGUSTINO GAGLIARDI, RAYMOND M. HAIR, JR., JON JOYCE, AND STEFANIE TAUB, | § § § § § § | |
| Defendants. | § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT (CLASS ACTION)

Plaintiffs Jon Blondell, Paul Harrington, Timothy Johnson, Stephanie Lowe, f/k/a Stephanie Marie, Chastity Marie, and Clayton Pritchard, individually and on behalf of a class of similarly situated persons, file this Complaint (Class Action) against Defendants Bruce Bouton, Duncan Crabtree-Ireland, Augustino Gagliardi, Raymond M. Hair, Jr., Jon Joyce, and Stefanie Taub, and in support thereof allege as follows:

## PARTIES

1.      Plaintiffs and Class Representatives Jon Blondell, Paul Harrington, Stephanie Lowe, f/k/a Stephanie Marie, Chastity Marie, and Clayton Pritchard are individual residents and

citizens of the state of Texas. Plaintiff and Class Representative Timothy Johnson is an individual resident and citizen of the state of Connecticut.

2.      Defendant Bruce Bouton is upon information and belief a resident of the state of Tennessee who can be served with process at 415 Church Street, Unit 1810, Nashville, Tennessee 37219;

3.      Defendant Duncan Crabtree-Ireland is upon information and belief a resident of the state of California who can be served with process at 8801 Lookout Mountain Avenue, Los Angeles, California, 90046 or at 5757 Wilshire Blvd., Los Angeles, California 90036;

4.      Defendant Augustino Gagliardi is upon information and belief a resident of the state of New York who can be served with process at 3831 Cannon Place, Bronx, New York, 10463 or at 1501 Broadway, Suite 600, New York, New York 10036;

5.      Defendant Raymond M. Hair, Jr., is upon information and belief a resident of the state of New York who can be served with process at 1501 Broadway, Suite 600, New York, New York 10036 or at 1505 Hunters Ridge Circle, Denton, Texas 76205;

6.      Defendant Jon Joyce is upon information and belief a resident of the state of California who can be served with process at 16967 Blance Place, Granada Hills, California 91344 or at 5757 Wilshire Blvd., Los Angeles, California 90036;

7.      Defendant Stefanie Taub is upon information and belief a resident of the state of California who can be served with process at 10826 Yarmouth Avenue, Los Angeles, California 91344 or at 5757 Wilshire Blvd., Los Angeles, California 90036;

8.      Defendants all currently serve as trustees of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund (the "Fund") and are sometimes referred to collectively herein as the "Trustees".

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), because it seeks certification of a class as to which the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a state different from at least one of the Defendants.

10.     This Court has personal jurisdiction over the Trustees and venue is proper in this District pursuant to Article XII, Section 1 of the July 26, 2012 Amended and Restated Agreement and Declaration of Trust of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund (the "Trust Agreement"), which provides that "venue for any dispute arising under this Agreement and Declaration of Trust shall be in New York". Venue is also proper in this District pursuant to 28 U.S.C. §§ 1391(b) & (c) because a substantial part of the acts and events giving rise to Plaintiffs' and the Class' claims occurred in this District, in that the Trustees are withholding payment to Class members of royalties earned from licensees operating in this District and because the Trustees have failed to distribute royalties to Class members residing within this District.

## SUMMARY OF CLAIMS AND REQUESTS FOR RELIEF

11.     Plaintiffs, on their own behalf and on behalf of a class of similarly situated session musicians and vocalists (the "Class"), allege that the Trustees have breached their fiduciary duties owed to Plaintiffs and the Class by failing to properly identify and pay them royalties which the Trustees collected for their benefit and are legally obligated to pay over to them and that the Trustees control royalties which in equity and good conscience should be paid to Plaintiffs and the Class.  Plaintiffs seek equitable/declaratory/injunctive relief against the Trustees requiring them to: (1) provide an accounting of their collection and payment of royalties owed to Plaintiffs and the Class; (2) follow procedures ordered by the Court in order to identify the Plaintiffs and the

other members of the Class to whom royalties are owed and then pay them those royalties held by

the Fund; and (3) to make additional pro rata distributions of royalties that still remain

undistributed to the Plaintiffs and the Class members to whom they previously paid royalties, such

that all of the currently undistributed royalties which they hold are distributed.  Alternatively,

Plaintiffs seek a judgment for damages payable out of the Fund in the amount of the undistributed

royalties currently held in the Fund by the Trustees to be paid to a special master appointed by the

Court to distribute those funds to Plaintiffs and the Class.    Plaintiffs also seek

equitable/declaratory/injunctive relief from the Court requiring the Trustees to adopt procedures

specified by the Court in order to assure that royalties collected by them in the future are

appropriately distributed to Plaintiffs and the Class.    Plaintiffs seek payment for all

equitable/declaratory/injunctive relief and/or payment of damages out of the Fund and not from

the Trustees personally.

## **FACTUAL ALLEGATIONS**

12.    Section 106 of the United States Copyright Act codified in Title 17 of the United

States Code grants the owner of a copyright in a sound recording the exclusive right to perform

and reproduce the sound recording publicly by means of a digital audio transmission. The

Copyright Royalty Board and Copyright Office of the U.S. Library of Congress have designated

SoundExchange, an affiliate and former subsidiary of the Recording Industry Association of

America, as the sole entity in the United States authorized to collect royalties from statutory

licensees for digital performance of sound recordings.

13.    Under 17 U.S.C. § 114(g), the royalties collected by SoundExchange from satellite radio, webcasters, cable TV music channels, and other digital services transmitting sound recordings must be distributed by it as follows:

(2) An agent designated to distribute receipts from the licensing of transmissions in accordance with subsection (f) [SoundExchange] shall distribute such receipts as follows:

(A) 50 percent of the receipts shall be paid to the copyright owner of the exclusive right under section 106(6) of this title to publicly perform a sound recording by means of a digital audio transmission.

(B) 2 ½ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Musicians (or any successor entity) to be distributed to nonfeatured musicians (*whether or not members of the American Federation of Musicians*) who have performed on sound recordings.

(C) 2 ½ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Television and Radio Artists (or any successor entity) to be distributed to nonfeatured vocalists (*whether or not members of the American Federation of Television and Radio Artists*) who have performed on sound recordings.

(D) 45 percent of the receipts shall be paid, on a per sound recording basis, to the recording artist or artists featured on such sound recording (or the persons conveying rights in the artists' performance in the sound recordings).

17 U.S.C. § 114(g)(2) (emphasis added).

14.    In other words, 50% of digital performance royalties are payable to the copyright owners of the sound recordings, 45% are payable to the featured artists, 2.5% are payable to the non-featured musicians (session musicians) and 2.5% are payable to the non-featured vocalists (session vocalists) (session musicians and vocalists are sometimes collectively referred to herein as "non-featured artists").  The 5% of the digital performance royalties payable to non-featured

artists are sometimes collectively referred to herein as the "Royalties." Significantly, the statute requires payment of the Royalties to non-featured artists regardless of their union membership.

15.    Plaintiffs and the other members of the Class are non-featured artists that have played on sound recordings performed on satellite radio, the web, cable TV music channels, and other digital services and that have not received the Royalties to which they are legally entitled. Because SoundExchange collects Royalties for the digital performance of sound recordings on an annual basis and remits them to the Fund on an annual basis, and because sound recordings are often digitally performed in multiple years, and because Plaintiffs and the other Class members very often perform on new sound recordings each year which are then digitally performed, Plaintiffs and the other members of the Class reasonably expect that they will be entitled to receive Royalties collected by SoundExchange and remitted to the Fund in the future. Plaintiffs and the other members of the Class are among the persons granted a right to receive the Royalties by 17 U.S.C. §§ 114(g)(2)(B) & (C). Each year thousands of sound recordings are digitally performed, and each year SoundExchange collects Royalties on thousands of songs, which Royalties are remitted to the Fund. Tens of thousands of non-featured artists perform on those sound recordings which are digitally performed each year and, thus, are members of the Class who are entitled to receive such Royalties.

16.    The Fund was originally formed on September 16, 1998, in the City and State of New York as a trust under New York law by execution on that date of the original version of the Trust Agreement. The current version of the Trust Agreement is the version amended and restated as of July 26, 2012, also in the City and State of New York. The Fund was formed by the American Federation of Musicians of the United States and Canada, AFL-CIO-CLC ("AFM") and the Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA") pursuant to

the Trust Agreement, which was executed by the Trustees.  A true and correct copy of the Trust Agreement is attached hereto as Exhibit A.

17.    The Fund was formed to fulfill two purposes: (1) to receive from SoundExchange, as the "independent administrator" required by 17 U.S.C. § 114(g)(2)(B) & (C), the Royalties collected by SoundExchange and distribute them to the non-featured artists; and (2) to collect from any collecting society, rights organization or other appropriate entity royalties held by that entity and to distribute such royalties and remuneration to eligible artists, including the non-featured artists (the "Other Royalties").  The Trust Agreement specifically places the power, duty and obligation on the Trustees to collect the Royalties and Other Royalties and distribute them to non-featured artists, and to do so regardless of their union membership.  Pursuant to the terms of the Trust Agreement, three of the Trustees were appointed by the AFM and three were appointed by SAG-AFTRA.

18.    Pursuant to 17 U.S.C. § 114(g)(2)(B), SoundExchange, as the representative of the copyright owners of sound recordings, and the AFM have jointly appointed the Fund to distribute the Royalties to the non-featured musicians (session musicians).  Pursuant to 17 U.S.C. § 114 (g)(2)(C), SoundExchange, as the representative of the copyright owner of sound recordings, and SAG-AFTRA have jointly appointed the Fund to receive from SoundExchange and distribute to the non-featured vocalists (session vocalists) the Royalties owed to them.

19.    The total amount of digital performance royalties collected by SoundExchange from statutory licensees in 2015 was in excess of $800,000,000, and the amount of Royalties it remitted to the Fund for distribution to non-featured artists (5%) accordingly exceeded $40,000,000 in just that year. Upon information and belief, the amount of money collected and to be collected by SoundExchange from statutory licenses for digital performances in 2016 will

exceed $900,000,000, and the amount of Royalties it has and/or will remit to the Fund for distribution in 2017 to non-featured artists will exceed $45,000,000.

20.     SoundExchange takes the position that its only obligation under applicable law is to remit the Royalties to the Fund and that it has no obligation to audit or ensure that the Trustees correctly distribute those Royalties. This has left the Trustees free from any oversight over their distribution of Royalties pursuant to 17 U.S.C. § 114(g)(2)(B) & (C) and the Trust Agreement.

21.     The Trustees have not distributed to Plaintiffs and the Class all of the Royalties they have collected from SoundExchange on behalf of Plaintiffs and the Class despite their legal and fiduciary obligation to do so.  Upon information and belief, as of March 31, 2015, the Fund held funds, the overwhelming majority of which are Royalties, but which may also include some Other Royalties, in excess of $100,000,000, which should have been distributed to Plaintiffs and the Class.  Upon information and belief, the overwhelming majority, but not all, of the undistributed Royalties are owed to Plaintiffs and other non-union members of the Class.  Upon information and belief, the Trustees have not distributed the $100 million plus in Royalties they currently hold in the Fund precisely because the vast majority are owed to non-union members of the Class and they, as appointees and members of the unions, simply do not really care whether non-union Class members receive the Royalties to which they are entitled.

22.     In order to distribute the Royalties, the Trustees have to ascertain the identities, addresses and taxpayer identification numbers (the addresses and taxpayer identification numbers are sometimes referred to herein as the "necessary information") of the non-featured artists who played on the digital performances for which the Fund collected Royalties.  They have a vastly greater success rate in determining the identities of and necessary information regarding union members entitled to receive Royalties, because the unions typically provide that information to

them.  For non-union non-featured artists, the Trustees have to discover that information themselves; no entity currently provides them with that information.

23.    The Trustees have four primary methods by which they could obtain the identities of and necessary information for non-union non-featured artists.  First, they can research the digital performances for which they receive Royalties using various resources, including websites, to ascertain the identities of the non-featured artists playing on those performances and they then can research those identified persons' addresses or other contact information (such as email addresses or phone numbers) using various resources, including the internet, and contact those artists for whom they have ascertained contact information to obtain the necessary information.  Second, they can make arrangements with various persons and entities to collect the identities and necessary information and provide it to them.  Third, they can publish a list of digital performances for which Royalties are owed ("covered recordings"), widely publicize to non-featured artists the availability of the Royalties and the existence of the covered recordings list and the need for those non-featured artists to make claims, and then allow those non-featured artists to identify to them the covered recordings on which the non-featured artists performed and provide their necessary information.  And, fourth, in those cases where the Trustees have the names of the non-featured artists but not the necessary information, they can publish a list of the names and allow non-featured artists to review that list for their names and provide their necessary information, again after having widely publicized to non-featured artists the availability of the Royalties and the need to review the names list and make claims.

24.    Unfortunately, in breach of the Trustees' legal and fiduciary obligations, and with no excuse for such failure, they have conducted minimal activities falling into the first two categories.  As to the third and fourth categories, while the Trustees do once a year publish lists of

covered recordings for which Royalties are owed and non-featured artists to whom Royalties are owed, they have done virtually nothing to publicize to non-featured artists the availability of the Royalties, the existence of those lists and the need for non-featured artists to check those lists and make claims for the Royalties owed to them.  Without such publication, the posting of the lists is a futile gesture, because the overwhelming majority of non-union non-featured artists have no knowledge of their rights to receive the Royalties and the need to check the lists posted by the Trustees.  And, to make matters worse, the Trustees have adopted policies which make it exceedingly difficult, if not downright impossible, for the very few non-featured artists who are aware of their rights to receive the Royalties and aware of the Fund's publication of lists of covered recordings and non-featured artists qualifying for payment of Royalties to timely review those lists and submit claims for payment.  Simply put, and as elaborated upon below, in intentional or reckless disregard of the rights to receive Royalties enjoyed by Plaintiffs and the Class under 17 U.S.C § 114(g)(2)(B) & (C) and the Trust Agreement, and in bad faith, the Trustees have effectively refused to distribute Royalties they know belong to Plaintiffs and the Class.

<u>Inadequate Research & Outreach Using Readily Available Information and Resources</u>

25.    In order to discharge their fiduciary duties, the Trustees should, but do not, conduct sufficient research and outreach utilizing readily available information and resources to identify Plaintiffs and the Class and pay them the Royalties they owed.  In connection with its deposit of Royalties with the Fund, SoundExchange provides the Fund with the names of the covered recordings and the number of digital performances of each such recording. With this information and other information described below that is readily available to the Trustees, they have sufficient information to calculate the amount of Royalties owed to Plaintiffs and each member of the Class in connection with the covered recordings and to identify and pay Plaintiffs and the Class the

Royalties to which they are entitled for their contribution of time and talent to those covered recordings.

26.    The Trustees could have easily conducted research utilizing publicly available information to determine the names of the Plaintiffs and the Class members who performed on the covered recordings and were entitled to Royalties for doing so.  Sources for such information includes liner notes and music credit databases such as Allmusic, Discogs, and Wikipedia.  The Trustees have made only minimal efforts in this regard because they have not used adequate numbers of personnel to perform this research.

27.    Further, the Trustees could easily have made inquiries through band websites, producer websites, record label websites, discussion groups, blogs, keyword advertising, social media and other similar channels to identify the Plaintiffs and Class members that performed on covered recordings and thus were entitled to Royalties.  They did not do so.

28.    Once the names of the Plaintiffs and the Class members were identified, the Fund could easily have, but did not, conduct extensive online research using an assortment of free and subscription websites (such as Lexis/Nexis and PublicInformation.com) to obtain contact information of the identified Plaintiffs and Class members.  In addition, they could have, but did not, conduct targeted advertising and outreach through trade journals, blogs, discussion groups, keyword advertising, social media, and other similar methods to inform and advise identified Plaintiffs and the Class members of their entitlement to Royalties and their need to provide the Fund with the necessary information.

29.    Of course, the Trustees' fiduciary obligations require that they utilize sufficient personnel, whether by employment or outsourcing, to conduct this research and outreach. However, the Trustees have not done so, as evidenced by the substantial amount of undistributed Royalties, the fact that the Class Members are almost uniformly unaware of the Fund and their right to collect Royalties, the fact that Class Members are largely unpaid, and the disproportionately small staff the Fund employs given the size of the royalty pool at stake. In fact, upon information and belief, the number of persons the Trustees utilized to perform such activities is only a fraction (perhaps 10%) of those necessary for the Trustees to adequately conduct the activities discussed above. Further, upon information and belief, key upper level employees of the Fund, including the Fund Administrator, only work part time for the Fund despite receiving salaries commensurate with full time work.

30.    Had the Trustees vigorously undertaken the investigation and outreach discussed above using already available resources and channels, they would have been far more successful in distributing the Royalties to Plaintiffs and the Class. If they utilize sufficient personnel to fully utilize these resources in the future, the Trustees should be able to distribute a significant majority of the currently held undistributed Royalties and will vastly increase the percentage of Plaintiffs and Class members receiving Royalties paid to the Fund in the future.

<u>Failure to Make Arrangements with Third Parties to Collect Information</u>

31.    Further, in order to discharge their fiduciary duties, the Trustees should have, but have not, made arrangements with third parties to help them to identify and obtain the necessary information for Plaintiffs and Class members owed Royalties.

32.    For example, the Gracenote database is a repository of information regarding sound recordings that is accessed by digital media players in order to provide individual users information regarding sound recordings. The information contained in the Gracenote database is typically

provided by the record label and/or producer of a sound recording, both of whom have information regarding the non-featured artists performing on a particular recording. The Trustees could have made arrangements with Gracenote for it to collect from record labels and producers the names and necessary information regarding non-featured artists and include it in this repository in order to be accessed by the Fund to allow the Fund to properly distribute Royalties, but they have never done so.

33.     Furthermore, several digital audio workstations ("DAWs"), namely Apple Logic, Pro-Tools, and Nuendo, are used in nearly every recording project resulting in digital performances.  These DAWs contain fields for the user to input information stored as metadata in relation to each sound recording.  The Trustees could have arranged for one or more of the fields to include names and necessary information of non-featured artists, allowing this information to be passed on, but they have not done so.

34.     In addition, several record distributors distribute the vast majority of recordings resulting in digital performances. These include the remaining major label distributors as well as Tunecore, CD Baby, The Orchard, Loudr, Distrokid, Ditto, Reverb Nation, and other independent distributors that distribute the vast majority of independent releases. The Trustees easily could have, but have not, made arrangements with these distributors to collect non-featured artists' names and necessary information relating to the recordings that are submitted for distribution, which information could then be gathered and utilized by the Trustees to identify and pay Plaintiffs and the Class.

35.     Beyond those information collection procedures, Broadcast Wave and other non-DAW software platforms are available for inputting metadata and associating it with particular recordings. Upon information and belief, the Trustees do not review covered recordings for this metadata even though they easily could do so.

36.     Still another possible information collection procedure would be asking SoundExchange, which  requires sound recording owners and featured artists to submit to it repertoire spreadsheets containing data regarding their sound recordings in order to help SoundExchange properly distribute royalties to them, to include fields in those spreadsheets submitted to it that identify the non-featured artists.  The Trustees could have easily made arrangements with SoundExchange to add such fields for the non-featured artists, which information could then be passed on to the Fund by SoundExchange to help identify the non-featured artists entitled to Royalties, but they have not done so.

37.     By way of further example, Blockchain technology is increasingly being utilized to associate metadata with recordings. In order to discharge their fiduciary duties, and especially in light of the amount of Royalties owed to the Class, the Trustees could participate in Blockchain development so that non-featured artist information is added as a metadata field and is collected for their use, but, upon information and belief, they have not attempted to do so.

38.     Had the Trustees undertaken the arrangements indicated above, they would have been far more successful in paying Plaintiffs and the Class members the Royalties to which they are entitled.  If the Trustees do so in the future, their success in distributing Royalties will approach 100%.

<u>Failure to Follow the Minimal Publication and Advertising Requirements of the Fund's
Current Guidelines and the Insufficiency of Those Guidelines</u>

39.     The Fund's Guidelines require that the Fund undertake certain publication steps and that it undertake advertising to non-featured artists of their rights to the Royalties and the procedures for obtaining them.  The Trustees have not complied with even these minimal and insufficient Guidelines.

40.     Specifically, the Fund's Guidelines provide at paragraph 6 that:

> There will be two lists posted on the website – one for musicians and one for vocalists – containing the covered sound recordings as defined in paragraph 9 herein for non-featured musicians and non-featured vocalists. Each record list posted on the Fund website shall identify all the non-featured musicians and non-featured vocalists, respectively, known to have participated on each covered sound recording.  It shall also identify the sound recordings for which it believes all non-featured musicians and/or non-featured vocalists have been identified.  The website shall provide a method for non-featured performers to claim that they performed on a record and/or provide personal or contact information.

Further, the Fund's Guidelines provide at paragraph 5 that the "Fund shall publish a notice in various trade publications no less than twice each calendar year directing non-featured performers to the website and informing them of the possible payments from the Fund.  At least one such notice must be placed no less than 60 days prior to a disbursement."

41.     The Trustees have not taken even these minimal (and deficient as discussed below) steps required by the Guidelines they adopted for the Fund.  For example, they do not post separate lists for vocalists and for musicians as the Fund's Guidelines require.  Also, upon information and belief, the Trustees have not undertaken *any* advertising of the Fund's existence and Plaintiffs' and Class members' entitlement to the Royalties, let alone publishing at least one notice not less than 60 days prior to each disbursement.  Further, even if the Trustees complied with these minimal requirements, they would not be sufficient to discharge the Trustees' fiduciary duties to Plaintiffs and the Class.  There is no reason to believe that any significant portion of the Class read "trade

publications" so regularly that they would see such bi-annual notices and timely learn of the necessity of reviewing the lists and making claims

42.    SoundExchange's efforts in this regard are instructive.  In order to meet its fiduciary obligation to fully disburse the royalties owed to featured artists, SoundExchange made extensive efforts to inform featured artists of its existence and mission through advertising and outreach, including advertising in industry journals, appearing at trade fairs, and engaging in other forms of targeted advertising and outreach.  SoundExchange did this repeatedly and for an extended period in order to fully disburse accumulated royalties as to which it was a trustee.

43.    The Fund could easily have and should have taken similar steps, but it has completely failed to do so, resulting in the substantial amount of undistributed Royalties in the Fund's accounts (in excess of $100 million) and the large scale failure to pay Plaintiffs and the Class the Royalties to which they are entitled. Specifically, in order to discharge their fiduciary duties, the Trustees should have, but have not, engaged media, marketing, and public relations consultants to design and implement a multi-media campaign designed to inform Plaintiffs and the Class of the existence of the Royalties and the Fund, their entitlement to the Royalties, and the need to check the Fund's website for the lists and to make claims for Royalties.  Such a multi-media campaign would likely include: (1) keyword internet advertising; (2) advertising and article placement in trade journals and other industry print mediums; (3) advertising and publication on websites and blogs, social media and discussion groups; (4) appearances and presentations at trade shows; and (5) outreach to other music collective societies, including BMI, ASCAP, SESAC, CCLI, the Harry Fox Agency, and to major and independent distributors, including Tunecore, CD Baby, the Orchard, Loudr, Ditto, and Reverb Nation, to get them to provide information to Plaintiffs and the Class.  There is every reason to believe that record labels and producers would

provide to non-featured artists at the time sound recordings are made information provided to them by the Fund regarding the non-featured artists' rights to collect and procedures for collecting Royalties.

44.    Had the Trustees developed and followed sufficient guidelines, rather than the insufficient Guidelines as described above, the Fund would have been far more successful in raising awareness by Class members of the Fund and their right to collect Royalties and in paying Class members the Royalties they are owed.  If the Trustees engage in such activities in the future, the percentage of currently undistributed Royalties and future Royalties paid to Plaintiffs and the Class could be brought close to 100%.

<u>Following Policies Which Prevent Distribution of Royalties</u>

45.    The Fund's policies adopted by the Trustees serve to make it almost impossible to pay Royalties to Plaintiffs and the Class. The Fund merely publishes the names of non-featured artists that it has identified but for whom it believes it needs additional information on a single, lengthy, non-hyperlinked list, after which the thousands of musicians and singers on the list are given only 45 days to make a claim. This names list does not identify the date it was published, so that a non-featured artist can know the 45 day deadline for making a claim. And, as discussed above, the Trustees fail to publicize the publication of the names list. Without knowing that a names list will be published and when, the chances of a Plaintiff and Class member discovering it and making a claim within 45 days is almost nil. Further, upon information and belief, Plaintiffs and Class members that contact the Fund and say that they performed on a covered recording but whose names have not already been placed by the Fund on the names list are told that they are not entitled to receive Royalties and are not allowed to make a claim for same. None of these policies are reasonable or have a good faith basis.  Indeed, they seemed designed to prevent successful claims from being made.

46.     Further, the Fund's Guidelines provide that "[a] non-featured performer who has been omitted from the Fund's list of performers for a record shall have forty-five days from the publication on the Fund's website of the titles ready for distribution to make a claim to the Fund." This provision is unreasonable, given the Trustee's failure to advertise and publicize the existence of the Fund and of the covered recordings list.  Indeed, the Trustees' failure to advertise and to indicate the date on which the covered recording list is published makes the chances of Plaintiffs and Class members successfully claiming Royalties almost nil. Such a policy is unreasonable, issued in bad faith and constitutes an abuse of discretion.

47.     To make matters worse, the Fund's Guidelines provide that "[a]ny monies unclaimed after six months (e.g., stale-dated checks, payments for which the Fund has no good address, Omissions Fund balance, etc.) shall revert to the Fund." There is no justification for any such time limit, much less one of only six months.  The Royalties belong to Plaintiffs and the Class, not the Fund, and cannot therefore "revert" to the Fund.  This provision, is therefore, unreasonable and serves no legitimate purpose, especially in light of the Trustees' almost total failure to make non-featured artists aware of the existence of the Royalties and the Fund, the publication of the covered recordings and names lists, and the need for non-featured artists to make claims for the Royalties.  Simply put, such policy is unreasonable, issued in bad faith and constitutes an abuse of discretion.

<u>Jon Blondell</u>

48.     Plaintiff and Class Representative Jon Blondell is owed Royalties for, among other recordings, "Wrong Way" by Sublime. However, the Fund's Guidelines provide only 45 days to make a claim after publication of the lists by the Fund and that Royalties unclaimed after six months "revert" to the Fund.  Given the Trustees' acts and omissions, including without limitation

those noted above, Plaintiff and Class Representative Jon Blondell was not aware of the existence

of the Fund and the necessity of making a claim, let alone aware of the publication on the Fund's

website of the covered recordings ready for distribution of Royalties, which included "Wrong

Way". More than six months has now passed. Accordingly, pursuant to the Fund's Guidelines,

and in the absence of judicial intervention, Plaintiff and Class Representative Jon Blondell is

unable to make a claim to receive his portion of the Royalties for "Wrong Way," to which he

contributed his time and talent. Mr. Blondell is a regularly performing musician who is likely to

be owed Royalties in the future but be unable to recover payment of them, given the unlikelihood

that he would find out about the Fund's publication of the lists in time to make a claim within 45

days of their publication.

<u>Paul Harrington</u>

49. Plaintiff and Class Representative Paul Harrington is owed royalties for digital

performances outside of the U.S. for, among other recordings, "Timber" by Pitbull. However, the

Fund's Guidelines provide only 45 days to make a claim after publication of the lists by the Fund

and that Royalties unclaimed after six months "revert" to the Fund. Given the Trustees' acts and

omissions, including without limitation those noted above, Plaintiff and Class Representative Paul

Harrington was not aware of the existence of the Fund and the necessity of making a claim, let

alone aware of the publication on the Fund's website of the covered recordings ready for

distribution of Royalties, including "Timber". More than six months has now passed.

Accordingly, pursuant to the Fund's Guidelines, and in the absence of judicial intervention,

Plaintiff and Class Representative Paul Harrington is unable to make a claim to receive his portion

of the Royalties for "Timber," to which he contributed his time and talent. Mr. Harrington is a

regularly performing musician who is likely to be owed Royalties in the future but be unable to

recover payment of them given the unlikelihood that he would find out about the Fund's publication of the lists in time to make a claim within 45 days of their publication.

Timothy Johnson

50.    Plaintiff and Class Representative Timothy Johnson is owed Royalties for, among other recordings, "Glorious" by Martha Munizzi. However, the Fund's Guidelines provide only 45 days to make a claim after publication of the lists by the Fund and that Royalties unclaimed after six months "revert" to the Fund.  Given the Trustees' acts and omissions, including without limitation those noted above, Plaintiff and Class Representative Timothy Johnson was not aware of the existence of the Fund and the necessity of making a claim, let alone aware of the publication on the Fund's website of the covered recordings ready for distribution of Royalties, including "Glorious".    More than six months has now passed.    Accordingly, pursuant to the Fund's Guidelines, and in the absence of judicial intervention, Plaintiff and Class Representative Timothy Johnson is unable to make a claim to receive his portion of the Royalties for "Glorious," to which he contributed his time and talent.  Mr. Johnson is a regularly performing musician who is likely to be owed Royalties in the future but be unable to recover payment of them given the unlikelihood that he would find out about the Fund's publication of the lists in time to make a claim within 45 days of their publication.

Stephanie Lowe, f/k/a Stephanie Marie

51.    Plaintiff and Class Representative Stephanie Lowe is owed Royalties for, among other recordings, "Commitment" by Leann Rimes.  However, the Fund's Guidelines provide only 45 days to make a claim after publication of the lists by the Fund and that Royalties unclaimed after six months "revert" to the Fund.  Given the Trustees' acts and omissions, including without limitation those noted above, Plaintiff and Class Representative Stephanie Lowe was not aware of

the existence of the Fund and the necessity of making a claim, let alone aware of the publication on the Fund's website of the covered recordings ready for distribution of Royalties, including "Commitment". More than six months has now passed. Accordingly, pursuant to the Fund's Guidelines, and in the absence of judicial intervention, Plaintiff and Class Representative Stephanie Lowe is unable to make a claim to receive her portion of the Royalties for "Commitment," to which she contributed her time and talent. Ms. Lowe is a regularly performing vocalist who is likely to be owed Royalties in the future but be unable to recover payment of them given the unlikelihood that she would find out about the Fund's publication of the lists in time to make a claim within 45 days of their publication.

<u>Chastity Marie</u>

52.     Plaintiff and Class Representative Chastity Marie is owed Royalties for, among other recordings, "Commitment" by Leann Rimes. However, the Fund's Guidelines provide only 45 days to make a claim after publication of the lists by the Fund and that Royalties unclaimed after six months "revert" to the Fund. Given the Trustees' acts and omissions, including without limitation those noted above, Plaintiff and Class Representative Chastity Marie was not aware of the existence of the Fund and the necessity of making a claim, let alone aware of the publication on the Fund's website of the covered recordings ready for distribution of Royalties, including "Commitment". More than six months has now passed. Accordingly, pursuant to the Fund's Guidelines, and in the absence of judicial intervention, Plaintiff and Class Representative Chastity Marie is unable to make a claim to receive her portion of the Royalties for "Commitment," to which she contributed her time and talent. Ms. Marie is a regularly performing vocalist who is likely to be owed Royalties in the future but be unable to recover payment of them given the

unlikelihood that she would find out about the Fund's publication of the lists in time to make a claim within 45 days of their publication.

Clayton Pritchard

53.    Plaintiff and Class Representative Clayton Pritchard is owed Royalties for, among other recordings, "Going Down For Real" ("GDFR") by Flo Rida. However, the Fund's Guidelines provide only 45 days to make a claim after publication of the lists by the Fund and that Royalties unclaimed after six months "revert" to the Fund.  Given the Trustees' acts and omissions, including without limitation those noted above, Plaintiff and Class Representative Clayton Pritchard was not aware of the existence of the Fund and the necessity of making a claim, let alone aware of the publication on the Fund's website of the covered recordings ready for distribution of Royalties, including "GDFR".  More than six months has now passed.  Accordingly, pursuant to the Fund's Guidelines, and in the absence of judicial intervention, Plaintiff and Class Representative Clayton Pritchard is unable to make a claim to receive his portion of the Royalties for "GDFR," to which he contributed his time and talent.  Mr. Pritchard is a regularly performing musician who is likely to be owed Royalties in the future but be unable to recover payment of them given the unlikelihood that he would find out about the Fund's publication of the lists in time to make a claim within 45 days of their publication.

**CLASS ALLEGATIONS**

54.    Plaintiffs seek to represent the following Class:

> All persons residing in the United States of America who contributed as non-featured artists to sound recordings for which SoundExchange has collected digital performance royalties and remitted Royalties to the Fund and who have not, in turn, received from the Fund the Royalties to which they are entitled under 17 U.S.C. § 114(g)(2)(B) & (C), regardless of whether they are union members.

The Class Period will run from the date the Fund was originally formed on September 16, 1998, until the date the Class is certified.

55.     Upon information and belief, there are tens of thousands of members of the Class such that joinder of all Class members is impracticable. This is evidenced by the fact that the yearly names list posted by the Fund on its website typically contains ten thousand or more names.

56.     There are questions of law and fact that are common to all of the members of the Class, including whether the Trustees owe fiduciary duties to the Class, whether the Trustees have breached their fiduciary duties by failing to pay Royalties to the Class and whether the Royalties ought to be, in equity and good conscience, paid to the Class.

57.     Plaintiffs' claims are typical of the claims of the Class. They all arise under the same legal theories and out of the same pattern of conduct by the Trustees.

58.     Plaintiffs will fairly and adequately represent and protect the interests of the Class because they have no conflicts of interest with the other members of the Class and because they have hired well-qualified counsel to represent the Class.

59.     This case is properly maintainable as a class action under Rule 23(b)(1), (2) & (3) of the Federal Rules of Civil Procedure because: (1) prosecuting separate actions by individual Class members would create a risk of incompatible standards of conduct for the Trustees; (2) the Trustees have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole; and/or (3) the questions of law or fact common to Class members predominate over any questions affecting only individual members and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  There will be no unusual difficulties in managing the Class.  A well-designed notice plan can give effective notice to all

members of the Class.  And, the very equitable/declaratory/injunctive relief sought by Plaintiffs and the Class against the Trustees, if granted by the Court, will make identification of and payments to the members of the Class possible.  Significantly, the amounts owed to each Class member can be mechanically and ministerially calculated based upon information already in the possession of the Trustees.

### FIRST CLAIM FOR RELIEF - BREACH OF FIDUCIARY DUTY FOR FAILURE TO DISTRIBUTE ROYALTIES TO PLAINTIFFS AND THE CLASS

60.    Plaintiffs incorporate the preceding and subsequent allegations as if fully set forth here verbatim, including without limitation the factual allegations contained in paragraphs 12 through 53 above.

61.    The Trustees are fiduciaries in regard to the Fund pursuant to, among other authorities, N.Y. Est. Powers & Trusts Law § 1-2.7, 17 U.S.C. §114(g)(2)(B) & (C), and the Trust Agreement.  Plaintiff and the Class are beneficiaries of the Fund.  As fiduciaries, the Trustees owe to Plaintiffs and the Class, as beneficiaries, fiduciary duties of loyalty, reasonableness and good faith, diligence and prudence, to act solely in the interest of Plaintiffs and the Class and to treat the union and non-union members of the Class impartially, all of which duties cannot be disclaimed by private agreement between the Trustees, including by the provisions of the Trust Agreement.

62.    The Trustees control substantial Royalties (likely in excess of $100 million) that are owed by statute, implementing regulations, the Trust Agreement, and applicable law to Plaintiffs and the Class. This money belongs to Plaintiffs and the Class, not to the Fund or the Trustees.  Furthermore, Plaintiffs and the Class reasonably expect that the Trustees will in the future collect additional Royalties owed to them and that the Trustees will likewise fail to distribute those Royalties to them.

63.    As set forth above in detail, by failing to make any real efforts to distribute the Royalties to Plaintiffs and the Class, the Trustees have effectively refused to distribute to Plaintiffs and the Class the Royalties owed to them, including the $100 million plus in Royalties currently held in the Fund's accounts.  This refusal of the Trustees to pay the Royalties to Plaintiffs and the Class constitutes breach by the Trustees of their fiduciary duties of loyalty, reasonableness and good faith, diligence and prudence, and to act solely in the interests of Plaintiffs and the Class, who are the beneficiaries of the Fund.  In addition, because the Trustees' refusal results from their indifference to whether Plaintiffs and the non-union members of the Class receive the Royalties to which they are entitled, the Trustees' refusal also constitutes a breach of their fiduciary duty to treat the beneficiaries of the Fund impartially.  The Trustees' breaches of their fiduciary duties have proximately caused damages to Plaintiffs and the Class in the amount of the Royalties owed to but not distributed to them, which they believe exceed $100 million.

64.    To the extent that any of the provisions of the Trust Agreement could be interpreted as providing discretion to the Trustees not to engage in some of the actions requested by Plaintiffs and the Class in connection with their distribution of  Royalties to Plaintiffs and the Class, such provisions are not enforceable under New York law.  Alternatively, to the extent that such provisions may grant discretion to the Trustees, the Trustees have nevertheless breached their fiduciary duties owed to Plaintiffs and the Class because their complete failure to make any real attempt to identify Plaintiffs and the Class and deliver the Royalties to them constitutes willful misconduct, bad faith and abuse of such discretion.

65.    As a remedy, Plaintiffs and the Class seek several layers of equitable/declaratory/injunctive relief.  First, they seek an accounting from the Trustees of all Royalties they have ever received from SoundExchange and of all expenditures they have ever

made out of those Royalties, including all payments made to non-featured artists. Second, Plaintiffs and the Class seek an order from the Court requiring the Trustees to engage in specified activities designed to identify as many of the Class members as possible and obtain their necessary information and pay to them the Royalties they are owed. Those specified activities will be the subject of evidence presented to this Court, but likely will include, as set forth above in detail: (1) paying for the necessary manpower to conduct and then conducting the necessary research regarding the identities and necessary information of the members of the Class, and (2) hiring marketing/advertising consultants to design and implement a national multi-media campaign designed to reach as many of members of the Class as possible and make known to them the availability of the Royalties, the Fund's publication of lists of covered recordings and non-featured artists eligible for payment of Royalties, and the necessity of and procedures for non-featured artists to review those lists and make claims for the Royalties owed to them. Those activities will also include rescinding existing polices and setting new policies regarding the publication of the lists and the time periods and methods for making claims by non-featured artists that do not unreasonably prevent them from successfully making claims, as discussed above.

66.    The third layer of equitable relief sought by Plaintiffs and the Class is an order by the Court requiring the Trustees to make additional pro rata distributions out of any funds that cannot be distributed despite full compliance by the Trustees with the Court's order regarding distribution of the Royalties currently held by the Trustees to those Plaintiffs and Class members who have been successfully paid. The ultimate goal of these orders is that the Trustees will distribute 100% of the Royalties that it currently holds to Plaintiffs and the Class. Fourth, and finally, Plaintiffs and the Class seek an order requiring the Trustees in connection with their future collection of Royalties from SoundExchange and distribution of them to Plaintiffs and the Class

to continue the same practices used to distribute the currently held Royalties and to engage in additional activities designed to ensure identification of eligible Plaintiffs and Class members and payment of Royalties to them.  Those additional requirements will also be the subject of evidence presented to the Court.  Those additional activities will likely include, as described in detail above, the Trustees arranging with SoundExchange, recording studios, record labels and producers, and software distributors to make it possible to actually collect the identities of and the necessary information regarding non-featured artists at the time of their participation in the creation of sound recordings and to make such information easily available to the Trustees.

67.    As an alternative to the equitable/declaratory/injunctive relief sought in order to cause the distribution of the unpaid Royalties currently held by the Trustees in the Fund, Plaintiffs and the Class seek a judgment requiring the Trustees to pay out of the Fund as damages all of the unpaid Royalties currently held by the Trustees in the Fund to a special master for distribution to Plaintiffs and the Class.

68.    The Trustees have not clearly and openly repudiated their obligations as Trustees. Accordingly, no statute of limitations has ever begun to run on these breach of fiduciary duty claims of Plaintiffs and the Class.

69.    Alternatively, the Trustees' breaches of their fiduciary duties as described above constitute continuing wrongs that are not referable exclusively to the day the original wrongs were committed since the Trustees have had an ongoing duty to distribute all of the Royalties collected by the Fund.  Accordingly, the statute of limitations on these breach of fiduciary duty claims of Plaintiffs and the Class has been tolled and will not begin to run until the commission of the last wrongful act of the Trustees.

## SECOND CLAIM FOR RELIEF-MONEY HAD AND RECEIVED

70.     Plaintiffs incorporate the preceding and subsequent allegations as if fully set forth here verbatim, including without limitation the factual allegations contained in paragraphs 12 through 53 above.

71.     As set forth above, the Trustees have received and currently retain Royalties belonging to Plaintiffs and the Class in excess of $100 million.  The Trustees have benefited from receipt of that money because it allowed for the payment of expenses by the Fund and continuation of the operations of the Fund.  Because the Royalties belong to Plaintiffs and the Class and because the Trustees have made no real effort to pay the Royalties to Plaintiffs and the Class, equity and good conscience require payment of the undistributed Royalties currently residing in the Fund's accounts and controlled by the Trustees to Plaintiffs and the Class.  This should be accomplished by payment of the Royalties out of the Fund to a special master for distribution to Plaintiffs and the Class.

72.     No contract exists between the Trustees and Plaintiffs and the Class.  The Trust Agreement does not constitute such a contract.  Accordingly, there is no bar to recovery in quasi-contract by Plaintiffs and the Class.

73.     The Fund collected Royalties on an annual basis that the Trustees were obligated to distribute to Plaintiffs and the Class and other Fund beneficiaries.  On an annual basis, the Trustees disbursed Royalties to some beneficiaries, but not to Plaintiffs and the Class.  Under New York law, the statute of limitations for money had and received as to the Royalties collected but not disbursed in a given year began to run for each year on the date the Fund disbursed Royalties to other beneficiaries but not to Plaintiffs and the Class.

## **DEMAND FOR JURY**

Plaintiffs request trial by jury of all issues in the case which can be tried to a jury, and they paid any required jury fee at the same time they paid the fee for filing this Complaint.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs Jon Blondell, Paul Harrington, Timothy Johnson, Stephanie Lowe, f/k/a Stephanie Marie, Chastity Marie, and Clayton Pritchard, individually and on behalf of a class of similarly situated persons, respectfully request the following relief against the Trustees:

1.      An order certifying this case to proceed as a class action pursuant to Federal Rule of Civil Procedure 23, appointing Plaintiffs as Class Representatives and appointing Plaintiffs' counsel as Class Counsel;

2.      A judgment awarding the equitable/declaratory/injunctive relief set forth above;

3.      A judgment awarding the damages set forth above;

4.      A judgment awarding Plaintiffs their costs and expenses;

5.      A judgment awarding Plaintiffs and the Class pre-judgment and post-judgment interest at the maximum rates permitted at law or in equity; and

6.      A judgment awarding Plaintiffs and the Class all such other and further relief, general or special, legal or equitable, to which they are justly entitled.

Respectfully submitted,


/s/ *Kieran M. Corcoran*
Kieran M. Corcoran
E.D.N.Y. Bar No. KC4935
kmc@lhlaw.net

LACKEY HERSHMAN, L.L.P.
1325 Avenue of the Americas
27th Floor
New York, NY  10019
(t) (212) 763-8491
(f) (212) 763-8304

-and-

Roger L. Mandel
Texas Bar No. 12891750
rlm@lhlaw.net
Bruce E. Bagelman
Texas Bar No. 01509700
beb@lhlaw.net

LACKEY HERSHMAN, L.L.P.
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone:      (214) 560-2201
Telecopier:     (214) 560-2203

-and-

Eric Zukoski,
Texas Bar No. 24010509
ezukoski@qslwm.com
James H. Birch,
Texas Bar No. 00797991
jbirch@qslwm.com

QUILLING, SELANDER, LOWNDS,
WINSLETT AND MOSER, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100
(214) 871-2111 (facsimile)

ATTORNEYS FOR PLAINTIFFS
JON BLONDELL, PAUL HARRINGTON,
TIMOTHY JOHNSON, STEPHANIE
LOWE FKA STEPHANIE MARIE,
CHASTITY MARIE, AND CLAYTON
PRITCHARD, INDIVIDUALLY AND ON
BEHALF OF A CLASS OF SIMILARLY
SITUATED PERSONS