IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
BROOKLYN DIVISION

| | | |
|---|---|---|
| JON BLONDELL, PAUL HARRINGTON, TIMOTHY JOHNSON, STEPHANIE LOWE, F/K/A STEPHANIE MARIE, CHASTITY MARIE, AND CLAYTON PRITCHARD, INDIVIDUALLY AND ON BEHALF OF A CLASS OF SIMILARLY SITUATED PERSONS, | § § § § § § § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. 1:17-cv-00372 RRM-RML |
| v. | § § | |
| BRUCE BOUTON, DUNCAN CRABTREE-IRELAND, AUGUSTINO GAGLIARDI, RAYMOND M. HAIR, JR., JON JOYCE, AND STEFANIE TAUB, | § § § § § | |
| Defendants. | § § § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT (CLASS ACTION)

Plaintiffs Jon Blondell, Paul Harrington, Timothy Johnson, Stephanie Lowe, f/k/a Stephanie Marie, Chastity Marie, and Clayton Pritchard, individually and on behalf of a class of similarly situated persons, file this First Amended Complaint (Class Action) against Defendants Bruce Bouton, Duncan Crabtree-Ireland, Augustino Gagliardi, Raymond M. Hair, Jr., Jon Joyce, and Stefanie Taub, and in support thereof allege as follows:

## PARTIES

1.      Plaintiffs and Class Representatives Jon Blondell, Paul Harrington, Stephanie Lowe, f/k/a Stephanie Marie, Chastity Marie, and Clayton Pritchard are individual residents and

citizens of the state of Texas. Plaintiff and Class Representative Timothy Johnson is an individual resident and citizen of the state of Connecticut.

2.      Defendant Bruce Bouton is upon information and belief a resident of the state of Tennessee who has appeared in this action and can be served via his counsel of record, Jared O. Freedman and Erica L. Ross, Jenner & Block LLP, 1099 New York Ave., NW, Suite 900, Washington, DC  20001.

3.      Defendant Duncan Crabtree-Ireland is upon information and belief a resident of the state of California who has appeared in this action and can be served via his counsel of record, Jared O. Freedman and Erica L. Ross, Jenner & Block LLP, 1099 New York Ave., NW, Suite 900, Washington, DC  20001.

4.      Defendant Augustino Gagliardi is upon information and belief a resident of the state of New York who has appeared in this action and can be served via his counsel of record, Jared O. Freedman and Erica L. Ross, Jenner & Block LLP, 1099 New York Ave., NW, Suite 900, Washington, DC  20001.

5.      Defendant Raymond M. Hair, Jr., is upon information and belief a resident of the state of New York who has appeared in this action and can be served via his counsel of record, Jared O. Freedman and Erica L. Ross, Jenner & Block LLP, 1099 New York Ave., NW, Suite 900, Washington, DC  20001.

6.      Defendant Jon Joyce is upon information and belief a resident of the state of California who has appeared in this action and can be served via his counsel of record, Jared O. Freedman and Erica L. Ross, Jenner & Block LLP, 1099 New York Ave., NW, Suite 900, Washington, DC  20001.

7.      Defendant Stefanie Taub is upon information and belief a resident of the state of California who has appeared in this action and can be served via her counsel of record, Jared O. Freedman and Erica L. Ross, Jenner & Block LLP, 1099 New York Ave., NW, Suite 900, Washington, DC 20001.

8.      Defendants all currently serve as trustees of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund (the "Fund") and are sometimes referred to collectively herein as the "Trustees."

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), because it seeks certification of a class as to which the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a state different from at least one of the Defendants.

10.     This Court has personal jurisdiction over the Trustees and venue is proper in this District pursuant to Article XII, Section 1 of the July 26, 2012 Amended and Restated Agreement and Declaration of Trust of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund (the "Trust Agreement"), which provides that "venue for any dispute arising under this Agreement and Declaration of Trust shall be in New York." Venue is also proper in this District pursuant to 28 U.S.C. §§ 1391(b) & (c) because a substantial part of the acts and events giving rise to Plaintiffs' and the Class' claims occurred in this District, in that the Trustees are withholding payment to Class members of royalties earned from licensees operating in this District and because the Trustees have failed to distribute royalties to Class members residing within this District.

## SUMMARY OF CLAIMS AND REQUESTS FOR RELIEF

11.     Plaintiffs, on their own behalf and on behalf of a class of similarly situated session musicians and vocalists (the "Class"), allege that the Trustees have breached their fiduciary duties owed to Plaintiffs and the Class by failing to properly identify and pay them royalties which the Trustees collected for their benefit and are legally obligated to pay over to them, some of which have been improperly paid to the Trustees' employers, the American Federation of Musicians of the United States and Canada, AFL-CIO-CLC ("AFM") and the Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA") (sometimes referred to collectively herein as the "Unions").  Plaintiffs and the Class further allege that the Trustees control royalties which in equity and good conscience should be paid to Plaintiffs and the Class pursuant to the cause of action for money had and received.

12.     Plaintiffs seek equitable/declaratory/injunctive relief against the Trustees requiring them to: (1) provide an accounting of their collection and payment of royalties owed to Plaintiffs and the Class; (2) follow procedures ordered by the Court in order to identify the Plaintiffs and the other members of the Class to whom royalties are owed and then pay them those royalties held by the Fund; and (3) to make additional pro rata distributions of royalties that still remain undistributed to the Plaintiffs and the Class members to whom they previously paid royalties, such that all of the currently undistributed royalties which they hold are distributed. Alternatively, Plaintiffs seek a judgment for damages payable out of the Fund in the amount of the undistributed royalties currently held in the Fund by the Trustees to be paid to a special master appointed by the Court to distribute those funds to Plaintiffs and the Class.  Plaintiffs also seek equitable/declaratory/injunctive relief from the Court requiring the Trustees to adopt

procedures specified by the Court in order to assure that royalties collected by them in the future are appropriately distributed to Plaintiffs and the Class.

13.     Pursuant to the Trust Agreement, the Fund is a trust and, under governing New York law, is not a legal entity capable of taking any action, including, but not limited to, receiving and disbursing money and suing or being sued.  Rather, it is only the Trustees who can and do engage in such activities in the name of the Fund.  Accordingly, all of the acts and failures to act which are the subject of this Complaint were engaged in by the Trustees, and they are the proper defendants. However, at this time, Plaintiffs seek payment for all equitable/declaratory/injunctive relief and/or payment of damages as set forth herein out of the Fund and not from the Trustees personally.

## FACTUAL ALLEGATIONS

14.     Section 106 of the United States Copyright Act codified in Title 17 of the United States Code grants the owner of a copyright in a sound recording the exclusive right to perform and reproduce the sound recording publicly by means of a digital audio transmission. The Copyright Royalty Board and Copyright Office of the U.S. Library of Congress have designated SoundExchange, an affiliate and former subsidiary of the Recording Industry Association of America, as the sole entity in the United States authorized to collect royalties from statutory licensees for digital performances of sound recordings.

15.     Under 17 U.S.C. § 114(g), the royalties collected by SoundExchange from satellite radio, webcasters, cable TV music channels, and other digital services transmitting sound recordings must be distributed by it as follows:

> (2) An agent designated to distribute receipts from the licensing of transmissions in accordance with subsection (f) [SoundExchange] shall distribute such receipts as follows:

(A) 50 percent of the receipts shall be paid to the copyright owner of the exclusive right under section 106(6) of this title to publicly perform a sound recording by means of a digital audio transmission.

(B) 2 ½ percent of the receipts shall be deposited in an escrow account managed by an *independent administrator* jointly appointed by copyright owners of sound recordings and the American Federation of Musicians (or any successor entity) to be distributed to nonfeatured musicians (*whether or not members of the American Federation of Musicians*) who have performed on sound recordings.

(C) 2 ½ percent of the receipts shall be deposited in an escrow account managed by an *independent administrator* jointly appointed by copyright owners of sound recordings and the American Federation of Television and Radio Artists (or any successor entity) to be distributed to nonfeatured vocalists (*whether or not members of the American Federation of Television and Radio Artists*) who have performed on sound recordings.

(D) 45 percent of the receipts shall be paid, on a per sound recording basis, to the recording artist or artists featured on such sound recording (or the persons conveying rights in the artists' performance in the sound recordings).

17 U.S.C. § 114(g)(2) (emphasis added).

16.     In other words, 50% of digital performance royalties are payable to the copyright owners of the sound recordings, 45% are payable to the featured artists, 2.5% are payable to the non-featured musicians (session musicians) and 2.5% are payable to the non-featured vocalists (session vocalists) (session musicians and vocalists are sometimes collectively referred to herein as "non-featured artists").  The 5% of the digital performance royalties payable to non-featured artists are sometimes collectively referred to herein as the "Royalties."  Significantly, the statute requires payment of the Royalties to non-featured artists regardless of their union membership.

17.     Plaintiffs and the other members of the Class are non-featured artists that have played on sound recordings performed on satellite radio, the web, cable TV music channels, and other digital services and that have not received the Royalties to which they are legally entitled.

Because SoundExchange collects Royalties for the digital performance of sound recordings on an annual basis and remits them to the Fund on an annual basis, and because sound recordings are often digitally performed in multiple years, and because Plaintiffs and the other Class members very often perform on new sound recordings each year which are then digitally performed, Plaintiffs and the other members of the Class reasonably expect that they will be entitled to receive Royalties collected by SoundExchange and remitted to the Fund in the future. Plaintiffs and the other members of the Class are among the persons granted a right to receive the Royalties by 17 U.S.C. §§ 114(g)(2)(B) & (C). Each year thousands of sound recordings are digitally performed, and each year SoundExchange collects Royalties on thousands of songs, which Royalties are remitted to the Fund. Tens of thousands of non-featured artists perform on those sound recordings which are digitally performed each year and, thus, are members of the Class who are entitled to receive such Royalties.

18.     The Fund was originally formed on September 16, 1998, in the City and State of New York as a trust under New York law by execution on that date of the original version of the Trust Agreement. The current version of the Trust Agreement is the version amended and restated as of July 26, 2012, also in the City and State of New York. The Fund was formed by the AFM and SAG-AFTRA pursuant to the Trust Agreement, which was executed by the Trustees. A true and correct copy of the Trust Agreement is attached hereto as Exhibit A.

19.     The Fund was formed to fulfill two purposes: (1) to receive from SoundExchange, as the "independent administrator" required by 17 U.S.C. § 114(g)(2)(B) & (C), the Royalties collected by SoundExchange and distribute them to the non-featured artists; and (2) to collect from any collecting society, rights organization or other appropriate entity royalties held by that entity and to distribute such royalties and remuneration to eligible artists, including the non-

featured artists (the "Other Royalties").  The Trust Agreement specifically places the power, duty and obligation on the Trustees to collect the Royalties and Other Royalties and distribute them to non-featured artists, and to do so regardless of their union membership.  Pursuant to the terms of the Trust Agreement, three of the Trustees were appointed by the AFM and three were appointed by SAG-AFTRA.

20.     Pursuant to 17 U.S.C. § 114(g)(2)(B), SoundExchange, as the representative of the copyright owners of sound recordings, and the AFM have jointly appointed the Fund to distribute the Royalties to the non-featured musicians (session musicians).  Pursuant to 17 U.S.C. § 114 (g)(2)(C), SoundExchange, as the representative of the copyright owner of sound recordings, and SAG-AFTRA have jointly appointed the Fund to receive from SoundExchange and distribute to the non-featured vocalists (session vocalists) the Royalties owed to them.

21.     SoundExchange takes the position that its only obligation under applicable law is to remit the Royalties to the Fund and that it has no obligation to audit or ensure that the Trustees correctly distribute those Royalties. This has left the Trustees free from any oversight over their distribution of Royalties pursuant to 17 U.S.C. § 114(g)(2)(B) & (C) and the Trust Agreement.

<u>The Trustees Have Failed to Satisfy Their Obligations<br>to Plaintiffs and the Other Members of the Class</u>

22.     The total amount of digital performance royalties collected by SoundExchange from statutory licensees in 2015 was in excess of $800,000,000, and the amount of Royalties it remitted to the Fund for distribution to non-featured artists (5%) accordingly exceeded $40,000,000 in just that year. Upon information and belief, the amount of money collected and to be collected by SoundExchange from statutory licenses for digital performances in 2016 will exceed $900,000,000, and the amount of Royalties it has and/or will remit to the Fund for distribution in 2017 to non-featured artists will exceed $45,000,000.  The Trustees have not

distributed to Plaintiffs and the Class all of the Royalties they have collected from SoundExchange on behalf of Plaintiffs and the Class despite their legal and fiduciary obligation to do so. Consequently, as of March 31, 2015, the Fund held funds, the overwhelming majority of which are Royalties, but which may also include some Other Royalties, in excess of $100,000,000, which should have been distributed to Plaintiffs and the Class. The overwhelming majority, but not all, of the undistributed Royalties are owed to Plaintiffs and other non-union members of the Class.

23.     The amount of undistributed funds is a reflection of the failure of the Trustees over many years to distribute royalties to non-union members. The Fund's Form 990 IRS tax returns for 2010 through 2014 show that the Trustees have failed to distribute the majority of the Royalties which they have received:

| Year | Royalty Receipts | Amount Distributed |
|------|------------------|--------------------|
| 2010 | $17,578,249 | $6,605,566 |
| 2011 | $23,920,316 | $15,553,273 |
| 2012 | $27,561,164 | $12,831,470 |
| 2013 | $41,699,519 | $13,013,664 |
| 2014 | $49,322,128 | $18,825,780 |

Minimal Tasks and the Trustees Refusal to Engage In them

24.     The Trustees have failed to distribute these Royalties owed to the Plaintiffs and the Class because they have refused to engage in even the most minimal tasks that would allow them to identify the Class members and the amounts owed to them. Indeed, the Fund's tax returns from 2010 to 2014 show that during that entire time, the Trustees each averaged working only one hour per week to perform their duties. By suggesting below methods for identifying

and paying Class members, Plaintiffs are not alleging that they are the only methods that could have been reasonably employed by the Trustees to fulfill their fiduciary duties. Rather, Plaintiffs offer these methods as examples of some of the practices that the Trustees could have undertaken in the past had they not in bad faith refused to carry out their duties and could undertake under order of the Court in order to fulfill their duties to Plaintiffs and the Class in the future.

25.     In order to distribute the Royalties, the Trustees have to ascertain the identities, addresses and taxpayer identification numbers (the addresses and taxpayer identification numbers are sometimes referred to herein as the "necessary information") of the non-featured artists who played on the digital performances for which the Fund collected Royalties. They have a vastly greater success rate in determining the identities of and necessary information regarding union members entitled to receive Royalties, because they have made arrangements with the Unions to make helpful information in the Unions' databases available to them and to otherwise assist them in identification efforts. For non-union non-featured artists, the Trustees have not made similar arrangements with entities that could provide helpful information and have failed to conduct independent research that would provide the necessary information.

26.     The Trustees have four primary methods by which they could obtain the identities of and necessary information for non-union non-featured artists. First, they can research the digital performances for which they receive Royalties using various resources, including websites, to ascertain the identities of the non-featured artists playing on those performances and they then can research those identified persons' addresses or other contact information (such as email addresses or phone numbers) using various resources, including the internet, and contact those artists for whom they have ascertained contact information to obtain the necessary information. Second, they can make arrangements with various persons and entities to collect

the identities and necessary information and provide it to them.  Third, they can publish a list of digital performances for which Royalties are owed ("covered recordings"), widely publicize to non-featured artists the availability of the Royalties and the existence of the covered recordings list and the need for those non-featured artists to make claims, and then allow those non-featured artists to identify to them the covered recordings on which the non-featured artists performed and provide their necessary information.  And, fourth, in those cases where the Trustees have the names of the non-featured artists but not the necessary information, they can publish lists of the names and allow non-featured artists to review those lists for their names and provide their necessary information, again after having widely publicized to non-featured artists the availability of the Royalties and the need to review the names lists and make claims.

27.    Unfortunately, in breach of the Trustees' legal and fiduciary obligations, and with no excuse for such failure, they have conducted only the very most minimal activities falling into the first two categories.  As elaborated on below, and as evidenced by the minimal amounts spent by the Trustees on research and the lack of personnel hired to perform such research, the statement on the Fund's website in the FAQ's that "the Fund's staff conducts extensive research" including "examining . . . documentation . . . such as liner notes and websites to identify non-featured performers" is simply not true.  As to the third and fourth categories, while the Trustees do once a year on the Fund's website set forth lists of covered recordings for which Royalties are owed and non-featured artists to whom Royalties are owed, they have done virtually nothing to publicize to non-featured artists the availability of the Royalties, the existence of those lists and the need for non-featured artists to check those lists and make claims for the Royalties owed to them.  Without such publication, the posting of the lists is a futile gesture, because the overwhelming majority of non-union non-featured artists have no knowledge of their rights to

receive the Royalties and the need to check the lists posted by the Trustees. And, to make matters worse, the Trustees have adopted policies which make it difficult for the very few non-featured artists who are aware of their rights to receive the Royalties and for the very few non-featured artists who are aware of the Fund's publication of lists of covered recordings to timely review those lists and submit claims for payment. Simply put, and as elaborated upon below, in intentional or reckless disregard of the rights to receive Royalties enjoyed by Plaintiffs and the Class under 17 U.S.C § 114(g)(2)(B) & (C) and the Trust Agreement, and in bad faith, the Trustees have effectively refused to distribute Royalties they know belong to Plaintiffs and the Class.

<u>Inadequate Research & Outreach Using Readily Available Information and Resources</u>

28. In order to discharge their fiduciary duties, the Trustees should, but do not, conduct sufficient research and outreach utilizing readily available information and resources to identify Plaintiffs and the Class and pay them the Royalties that they are owed. In connection with its deposit of Royalties with the Fund, SoundExchange provides the Fund with the names of the covered recordings and the number of digital performances of each such recording. With this information and other information described below that is readily available to the Trustees, they have sufficient information to calculate the amount of Royalties owed to Plaintiffs and each member of the Class in connection with the covered recordings and to identify and pay Plaintiffs and the Class the Royalties to which they are entitled for their contribution of time and talent to those covered recordings.

29. The Trustees could have easily conducted research utilizing publicly available information to determine the names of the Plaintiffs and the Class members who performed on the covered recordings and were entitled to Royalties for doing so, but they have failed to do so. Sources for such information include liner notes and music credit databases such as Allmusic,

Discogs, and Wikipedia.   Further, the Trustees could easily have made inquiries through band websites, producer websites, record label websites, discussion groups, blogs, keyword advertising, social media and other similar channels to identify the Plaintiffs and Class members that performed on covered recordings and thus were entitled to Royalties.  They did not do so. Further, Broadcast Wave and other non-DAW software platforms are available for inputting metadata and associating it with particular recordings. Upon information and belief, the Trustees do not review covered recordings for this metadata even though they easily could do so.

30.     Once the names of the Plaintiffs and the Class members were identified, the Fund could easily have, but did not, conduct extensive online research using an assortment of free and subscription websites (such as Lexis/Nexis and PublicInformation.com) to obtain contact information of the identified Plaintiffs and Class members.  In addition, they could have, but did not, conduct targeted advertising and outreach through trade journals, blogs, discussion groups, keyword advertising, social media, and other similar methods to inform and advise both unidentified and identified Plaintiffs and the Class members of their entitlement to Royalties and their need to provide the Fund with the necessary information.

31.     The Fund's tax returns for 2010 through 2014 show that the Trustees spent such insignificant amounts on research and advertising of this type when compared to the amounts of the Royalties which they received (less than 1% of the Royalties received) so as to properly allow characterization of the Trustees' actions as a bad faith refusal to distribute the Royalties to Plaintiffs and the Class:

| Year | Receipts | Research Expense | Advertising Expense |
|------|----------|------------------|---------------------|
| 2010 | $17,578,249 | $69,859 | $30,531 |
| 2011 | $23,920,316 | $74,740 | $25,595 |

| 2012 | $27,561,164 | $175,967 | $129,534 |
| 2013 | $41,699,519 | $181,498 | $26,154 |
| 2014 | $49,322,128 | $332,844 | $24,178 |

32.     Of course, the Trustees' fiduciary obligations require that they utilize sufficient personnel, whether by employment or outsourcing, to conduct this research and outreach. However, the Trustees have not done so, as evidenced by the substantial amount of undistributed Royalties, the fact that the Class Members are almost uniformly unaware of the Fund and their right to collect Royalties, the fact that Class Members are largely unpaid, and the disproportionately small staff the Trustees employ given the size of the royalty pool at stake. Specifically, according to the Fund's website, the Trustees only employ ten people to conduct research in the Sound Recording Division of the Fund.  In contrast, upon information and belief, key personnel of the Fund believe that 60 or more persons are required to fully and properly conduct the necessary research.  The Trustees' failure to employ sufficient personnel is another example of their bad faith refusal to distribute the Royalties to Plaintiffs and the Class.

33.     Had the Trustees vigorously undertaken investigation and outreach of the type discussed above using already available resources and channels, they would have been far more successful in distributing the Royalties to Plaintiffs and the Class.  If they utilize sufficient personnel to fully utilize these resources in the future, the Trustees should be able to distribute a significant majority of the currently held undistributed Royalties and to vastly increase the percentage of Plaintiffs and Class members receiving Royalties paid to the Fund in the future.

<u>Failure to Make Arrangements with Third Parties to Collect Information</u>

34.     Further, in order to discharge their fiduciary duties, the Trustees should have, but have not, made arrangements with third parties to help them to identify and obtain the necessary

information for Plaintiffs and Class members owed Royalties. Their arrangements with the Unions, described below, offer a perfect example.

35.     For example, the Gracenote database is a repository of information regarding sound recordings that is accessed by digital media players in order to provide individual users information regarding sound recordings. The information contained in the Gracenote database is typically provided by the record label and/or producer of a sound recording, both of whom have information regarding the non-featured artists performing on a particular recording. The Trustees could have made arrangements (including by paying compensation for same, if necessary) with Gracenote for it to collect from record labels and producers the names and necessary information regarding non-featured artists and include it in this repository in order to be accessed by the Fund to allow the Fund to properly distribute Royalties, but they have never done so.

36.     Furthermore, several digital audio workstations ("DAWs"), namely Apple Logic, Pro-Tools, and Nuendo, are used in nearly every recording project resulting in digital performances. These DAWs contain fields for the user to input information stored as metadata in relation to each sound recording. The Trustees could have arranged (including by paying compensation for same, if necessary) for one or more of the fields to include names and necessary information of non-featured artists, allowing this information to be passed on, but they have not done so.

37.     In addition, several record distributors distribute the vast majority of recordings resulting in digital performances. These include the remaining major label distributors as well as Tunecore, CD Baby, The Orchard, Loudr, Distrokid, Ditto, Reverb Nation, and other independent distributors that distribute the vast majority of independent releases. The Trustees easily could have, but have not, made arrangements (including by paying compensation for

same, if necessary) with these distributors to collect non-featured artists' names and necessary information relating to the recordings that are submitted for distribution, which information could then be gathered and utilized by the Trustees to identify and pay Plaintiffs and the Class.

38.     Still another possible information collection procedure would be asking SoundExchange, which requires sound recording owners and featured artists to submit to it repertoire spreadsheets containing data regarding their sound recordings in order to help SoundExchange properly distribute royalties to them, to include fields in those spreadsheets submitted to it that identify the non-featured artists. The Trustees could have easily made arrangements with SoundExchange to add such fields for the non-featured artists, which information could then be passed on to them by SoundExchange to help identify the non-featured artists entitled to Royalties, but they have not done so.

39.     By way of further example, Blockchain technology is increasingly being utilized to associate metadata with recordings. In order to discharge their fiduciary duties, and especially in light of the amount of Royalties owed to the Class, the Trustees could participate in Blockchain development so that non-featured artist information is added as a metadata field and is collected for their use, but, upon information and belief, they have not attempted to do so.

40.     Had the Trustees undertaken the arrangements indicated above, they would have been far more successful in paying Plaintiffs and the Class members the Royalties to which they are entitled. If the Trustees do so in the future, their success in distributing Royalties will approach 100%.

<u>Failure to Follow the Minimal Publication and Advertising Requirements of the Fund's<br>Current Guidelines and the Insufficiency of Those Guidelines</u>

41.     The Fund's Guidelines require that the Fund undertake certain publication steps and that it undertake advertising to non-featured artists of their rights to the Royalties and the

procedures for obtaining them.  The Trustees have not complied with even these minimal and insufficient Guidelines.

42.     Specifically, the Fund's Guidelines provide, in pertinent part, in paragraph 6 that:

> There will be two lists posted on the website – one for musicians and one for vocalists – containing the covered sound recordings as defined in Paragraph 9 herein for non-featured musicians and non-featured vocalists. Each record list posted on the Fund website shall identify all the non-featured musicians and non-featured vocalists, respectively, known to have participated on each covered sound recording.  It shall also identify the sound recordings for which it believes all non-featured musicians and/or non-featured vocalists have been identified.  The website shall provide a method for non-featured performers to claim that they performed on a record and/or provide personal or contact information.

Further, the Fund's Guidelines provide in paragraph 5 that the "Fund shall publish a notice in various trade publications no less than twice each calendar year directing non-featured performers to the website and informing them of the possible payments from the Fund.  At least one such notice must be placed no less than 60 days prior to a disbursement."

43.     The Trustees have not taken even these minimal (and deficient as discussed below) steps required by the Guidelines they adopted for the Fund.  For example, they do not post separate lists for vocalists and for musicians as the Fund's Guidelines require.  Also, the Trustees have not undertaken *any* advertising of the Fund's existence and Plaintiffs' and Class members' entitlement to the Royalties, let alone publishing notice in various trade publications at least twice a year, including at least one such notice not less than 60 days prior to each disbursement.  Had the Trustees done so, there is a chance that some of the Plaintiffs and some small portion of the Class might have obtained payment of Royalties owed to them.  However, even if the Trustees had complied with these minimal requirements, they would not been sufficient to discharge the Trustees' fiduciary duties to Plaintiffs and the Class.  There is no reason to believe that any significant portion of the Class read "trade publications" so regularly

that they would see such bi-annual notices and timely learn of the necessity of reviewing the lists and making claims

44.     SoundExchange's efforts in this regard are instructive.   In order to meet its fiduciary obligation to fully disburse the royalties owed to featured artists, SoundExchange made extensive efforts to inform featured artists of its existence and mission through advertising and outreach, including advertising in industry journals, appearing at trade fairs, and engaging in other forms of targeted advertising and outreach.  SoundExchange did this repeatedly and for an extended period in order to fully disburse accumulated royalties as to which it was a trustee.

45.     The Fund could easily have and should have taken similar steps, but it has completely failed to do so, resulting in the substantial amount of undistributed Royalties in the Fund's accounts (in excess of $100 million) and the large scale failure to pay Plaintiffs and the Class the Royalties to which they are entitled. Specifically, in order to discharge their fiduciary duties, the Trustees should have, but have not, engaged media, marketing, and public relations consultants to design and implement a multi-media campaign designed to inform Plaintiffs and the Class of the existence of the Royalties and the Fund, their entitlement to the Royalties, and the need to check the Fund's website for the lists and to make claims for Royalties.  Such a multi-media campaign would likely include: (1) keyword internet advertising; (2) advertising and article placement in trade journals and other industry print mediums; (3) advertising and publication on websites and blogs, social media and discussion groups; (4) appearances and presentations at trade shows; and (5) outreach to other music collective societies, including BMI, ASCAP, SESAC, CCLI, the Harry Fox Agency, and to major and independent distributors, including Tunecore, CD Baby, the Orchard, Loudr, Ditto, and Reverb Nation, to get them to provide information to Plaintiffs and the Class.  There is every reason to believe that record

labels and producers would provide to non-featured artists at the time sound recordings are made information provided to them by the Fund regarding the non-featured artists' rights to collect, and procedures for collecting, Royalties.  Indeed, if necessary, the Trustees could pay record labels and producers to do so.

46.     Tellingly, Congress itself noted at the beginning how important it would be for the entities ultimately responsible for distributing the Royalties to adopt proper guidelines: "[t]he Committee [on the Judiciary] believes that it will be especially important for these independent administrators to identify and pay those vocalists and musicians who are not members of the union.  They must establish procedures designed to enable all eligible parties to receive royalties, including nonunion members."  H.R.Rep. 104-274, 104th Con., 1st Sess., (1995 WL 606862).  Unfortunately, the Trustees have woefully breached their duties in this regard to both union and non-union members.

47.     Indeed, the Trustees have adopted Guidelines which actually serve to discourage Class members from claiming their Royalties.  Once a year, the Fund publishes a list of covered sound recordings for which it will pay Royalties.  The title of each covered sound recording is a hyperlink to the names of all non-featured artists who the Trustees have identified as eligible to receive Royalties in connection with that particular covered sound recording.  The covered sound recordings page also contains links to previous years' lists of covered sound recordings and indicates that if a Class member finds a covered sound recording on which the member played on one of the previous years' lists and upon clicking on the title of the covered sound recording finds his or her name listed, the member can recover Royalties from those previous years. However, the Fund's Guidelines provide that "[a]ny monies unclaimed after six months . . . shall revert to the Fund."  This, of course, is at odds with the indication that Royalties will still be paid

to Class members who find themselves on previous years' lists:  Accordingly, it seems designed to chill Class members from seeking to claim such Royalties.

48.     The Guidelines' chilling effect is even worse for a Class member who finds a title on the covered sound recordings list on which the member performed but does not find his or her name listed.  Specifically, the Fund's Guidelines provide that "[a] non-featured performer who has been omitted from the Fund's list of performers for a record shall have forty-five days from the publication on the Fund's website of the titles ready for distribution to make a claim to the Fund.  The Fund, in its sole discretion, may process claims received after forty-five days but prior to disbursement."  Class members who discover the covered sound recordings after the forty-five days would be likely not to make a claim under the belief they were too late and that the Fund would likely not exercise its discretion to waive the claim deadline.  And, such belief would be more than justified, as Class members calling the Fund after the forty-five days are told they are not eligible to make a claim.  Further, if the Class member made the discovery after the April 30 disbursement date for that year, there would be no chance of payment.

49.     Because the Royalties belong to Plaintiffs and the Class and the Fund exists for the sole purpose of distributing the Royalties to them, there is no justification for publishing and/or enforcing any time limits on making claims or for the Royalties to ever revert to the Fund.  Accordingly, publishing and/or enforcing these Guidelines is unreasonable and constitutes bad faith and an abuse of discretion.   And, telling Plaintiffs and the Class they can solve the timeliness problem by checking the covered sound recordings list every forty-four days represents an abdication by the Trustees of their fiduciary obligations.  Such checking would be an unrealistic and unreasonable burden to put on busy working musicians, the vast majority of whom are unaware of the existence of the Royalties and of the list.  Such a position by the

Trustees represents them trying to shift the burden of distributing the Royalties on to the members of the Class from themselves and the highly compensated staff of the Fund in violation of their fiduciary duties.

50.     Had the Trustees developed and followed sufficient guidelines, rather than the insufficient and counter-productive Guidelines as described above, the Fund would have been far more successful in raising awareness by Class members of the Fund and their right to collect Royalties and in paying Class members the Royalties they are owed.  If the Trustees engage in such activities in the future, the percentage of currently undistributed Royalties and future Royalties paid to Plaintiffs and the Class could be brought close to 100%.

### The Trustees' True Loyalties Lie with AFM and SAG-AGTRA, Dual Employees of the Fund and Those Unions and the Members of the Unions

51.     17 U.S.C. §114(g)(2)(B) & (C) requires that the Royalties shall be "deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the [AFM/SAG-AFTRA] (or any successor entity) to be distributed to non-featured [performers] (whether or not members of the American Federation of Musicians/American Federation of Radio and Television Artists) who have performed on sound recordings."  The independence of the administrator is crucial given the congressional mandate that the royalties be distributed regardless of union status.   Unfortunately, the Trustees are anything but independent, because they are all current or former officers and employees and members of the AFM and SAG-AFTRA. To make matters worse, the Trustees are not compensated by the Fund, but rather by their employers—the AFM and SAG-AFTRA. As a natural result, the Trustees have done much to benefit the AFM and SAG-AFTRA but have failed to perform the duties they owe to Plaintiffs and the members of the Class.

52.     The loyalties of the Trustees and the Fund Administrator become obvious when their relationships to the Unions are examined.  The Chairmen of the Board of Trustees are Ray Hair and Duncan Crabtree-Ireland. Ray Hair is the president of the AFM and serves on the Board of Directors of SoundExchange. Duncan Crabtree-Ireland is the CEO and general counsel of AFTRA. Trustee Tino Gagliardi is on the Executive Board of the AFM. Trustee Stefanie Taub is the National Manager of Sound Recordings for SAG-AFTRA. Trustee Jon Joyce is on the Board of the SAG-AFTRA Foundation. Trustee Bruce Bouton is on the Electronic Media Oversight Committee of the AFM and is the Intellectual Property Rights Committee Chair of the Recording Musicians Association, which, upon information and belief, is an affiliated entity of the AFM. The Administrator of the Fund, Dennis Dreith, was, and possibly still is, a member of the AFM Negotiating Committee. Mr. Dreith was the President of the Recording Musician Association for over 15 years (again, believed to be an affiliated entity of the AFM).  Mr. Dreith is currently the Administrator of the Film Musicians Secondary Marketing Fund formed by a collective bargaining agreement between the AFM and the Alliance of Motion Picture and Television Producers. The Chief Operating Officer of the Fund, Shari Hoffman, was previously the supervisor of Electronic Media (Symphonic Services) for the AFM.

53.     The non-independent and intertwined relationship of the Fund and the AFM and SAG-AFTRA does not end with personnel. The Fund's Form 990 IRS tax return for 2014 shows payments to the AFM and to SAG-AFTRA of $272,839 each.  Consistently, the Fund's 2015 Financial Statements show that "Administrative Fees – Unions" were paid by the Fund in the amount of $545,690. The AFM's 2015 Annual Report indicates that payments to the AFM from the Fund "are more than $350,000" and that "[w]e exect [sic] the AFM SAG-AFTRA fund to grow to $1 million in 2016."

54.     The AFM's 2015 Annual Report explains the ostensible purpose of those payments:

> On July 22, 2013, the Fund entered into a Data Purchase and Services Agreement with the AFM and SAG-AFTRA, pursuant to which each union agreed (a) to provide the Fund with access to member databases, session reports and other recording information including contact information regarding members and non-members for the purpose of aiding the distribution or royalties collected by the Fund; (b) to use commercially reasonable efforts to further the interests in the Fund and the Fund's beneficiaries through their participation in SoundExchange, the Alliance of Artists and Record Companies; international performers' organizations, the musicFIRST Coalition and similar union activities; (c) to make commercially reasonable efforts to obtain from its members authorizations to act on their behalf for the purpose of collecting and distributing domestic and foreign royalties; and (d) other services as agreed. Pursuant to the Data Purchase and Services Agreement, and in exchange for the data and services provided, the Fund agreed to pay to each union 1-1/2% of the amount distributed in each distribution. During the year ended March 31, 2015, the Fund paid $272,845 to each union.

55.     This "service" by the AFM and SAG-AFTRA of aiding the Trustees in delivering Royalties to their members is the kind of service that the AFM and SAG-AFTRA should undertake on behalf of their members in return for their dues without compensation from the Fund, which the Trustees either know or should know. Accordingly, these payments represent the Trustees improperly using the Royalties to benefit the Unions to whom they owe their true allegiance. At the same time, however, the "agreement" with the Unions demonstrates the types of agreements that the Trustees properly could have entered into with other entities to obtain necessary information about non-union members of the Class.

56.     These direct payments to the Unions are not the only way the Trustees use the Royalties to improperly benefit the Unions. According to the Fund's 2014 Form 990, key upper level employees of the Fund, including the Fund Administrator, the IT Director and the HR and Legal Affairs Director, only work half time for the Fund despite receiving salaries commensurate

with full time work:  $273,646 for working 20 hours per week for the Fund Administrator, $98,675 for working 20 hours for the IT Director, and $42,781 for working 24 hours for the HR and Legal Affairs Director.  The Form 990 also shows that these key employees do not spend the other 20 hours a week on unrelated activities; rather, they also work for "related organizations;" namely the AFM and SAG-AFTRA or their affiliated entities, which benefit by having work performed for them by these personnel who are paid, at least in part, from the Royalties.

57.    In sum, these facts make clear that the Trustees and the Fund's key personnel are not independent and have as their primary goal the benefit of the Unions, the dual employees of the Fund and the Unions and the Unions' members.

<u>The Trustees' Motives</u>

58.    Of course, the motives of the Trustees, high-ranking employees of the Unions, for effectively refusing to distribute the Royalties to Plaintiffs and the Class by making no real effort to locate and pay them and adopting policies which make it very difficult for Plaintiffs and Class members to identify themselves can only be inferred, but they are reasonably clear—to benefit the Unions and their members and the dual employees of the Fund and the Unions.  The non-payment of Plaintiffs and other non-union Class members allows the Trustees to funnel monetary benefits, directly and indirectly, to the Unions.  It also provides an incentive to musicians to become Union members and stay members in order to receive the Royalties they would not receive as non-members, which greatly benefits the Unions.  From the Trustees' perspective, not paying Plaintiffs and other non-union members is not only not a bad thing, it is a good thing because it serves to benefit the Unions.  And, it allows them to only donate, on average, one uncompensated hour per week to their duties as Trustees

<u>Jon Blondell</u>

59.     Plaintiff and Class Representative Jon Blondell is owed Royalties for, among other recordings, "Wrong Way" by Sublime since 1998. However, the Fund's Guidelines provide that Royalties unclaimed after six months "revert" to the Fund.  Given the Trustees' acts and omissions, including without limitation those noted above, Plaintiff and Class Representative Jon Blondell was not aware of the existence of the Fund and the necessity of making a claim, let alone aware of the publication on the Fund's website of the covered recordings ready for distribution of Royalties, which included "Wrong Way."  More than six months has now passed. Accordingly, pursuant to the Fund's Guidelines, and in the absence of judicial intervention, Plaintiff and Class Representative Jon Blondell is unable to make a claim to receive his portion of the Royalties for "Wrong Way," to which he contributed his time and talent.  Mr. Blondell is a regularly performing musician who is likely to be owed Royalties in the future but be unable to recover payment of them, given the unlikelihood that he would find out about the Fund's publication of the lists in time to make a claim within 45 days of their publication.

<u>Paul Harrington</u>

60.     Plaintiff and Class Representative Paul Harrington is owed royalties for digital performances outside of the U.S. for, among other recordings, "Timber" by Pitbull since 2013. However, the Fund's Guidelines provide only 45 days to make a claim after publication of the lists by the Fund and that Royalties unclaimed after six months "revert" to the Fund.  Given the Trustees' acts and omissions, including without limitation those noted above, Plaintiff and Class Representative Paul Harrington was not aware of the existence of the Fund and the necessity of making a claim, let alone aware of the publication on the Fund's website of the covered recordings ready for distribution of Royalties, including "Timber".  More than six months has

now passed.  Accordingly, pursuant to the Fund's Guidelines, and in the absence of judicial intervention, Plaintiff and Class Representative Paul Harrington is unable to make a claim to receive his portion of the Royalties for "Timber," to which he contributed his time and talent. Mr. Harrington is a regularly performing musician who is likely to be owed Royalties in the future but be unable to recover payment of them given the unlikelihood that he would find out about the Fund's publication of the lists in time to make a claim within 45 days of their publication.

<u>Timothy Johnson</u>

61.     Plaintiff and Class Representative Timothy Johnson is owed Royalties for, among other recordings, "Glorious" by Martha Munizzi since 2003. However, the Fund's Guidelines provide that Royalties unclaimed after six months "revert" to the Fund.  Given the Trustees' acts and omissions, including without limitation those noted above, Plaintiff and Class Representative Timothy Johnson was not aware of the existence of the Fund and the necessity of making a claim, let alone aware of the publication on the Fund's website of the covered recordings ready for distribution of Royalties, including "Glorious".  More than six months has now passed. Accordingly, pursuant to the Fund's Guidelines, and in the absence of judicial intervention, Plaintiff and Class Representative Timothy Johnson is unable to make a claim to receive his portion of the Royalties for "Glorious," to which he contributed his time and talent.  Mr. Johnson is a regularly performing musician who is likely to be owed Royalties in the future but be unable to recover payment of them given the unlikelihood that he would find out about the Fund's publication of the lists in time to make a claim within 45 days of their publication.

## Stephanie Lowe, f/k/a Stephanie Marie

62.    Plaintiff and Class Representative Stephanie Lowe is owed Royalties for, among other recordings, "Commitment" by Leann Rimes since 1998.  However, the Fund's Guidelines provide that Royalties unclaimed after six months "revert" to the Fund.  Given the Trustees' acts and omissions, including without limitation those noted above, Plaintiff and Class Representative Stephanie Lowe was not aware of the existence of the Fund and the necessity of making a claim, let alone aware of the publication on the Fund's website of the covered recordings ready for distribution of Royalties, including "Commitment".  More than six months has now passed. Accordingly, pursuant to the Fund's Guidelines, and in the absence of judicial intervention, Plaintiff and Class Representative Stephanie Lowe is unable to make a claim to receive her portion of the Royalties for "Commitment," to which she contributed her time and talent.  Ms. Lowe is a regularly performing vocalist who is likely to be owed Royalties in the future but be unable to recover payment of them given the unlikelihood that she would find out about the Fund's publication of the lists in time to make a claim within 45 days of their publication.

## Chastity Marie

63.    Plaintiff and Class Representative Chastity Marie is owed Royalties for, among other recordings, "Commitment" by Leann Rimes since 1998. However, the Fund's Guidelines provide that Royalties unclaimed after six months "revert" to the Fund.  Given the Trustees' acts and omissions, including without limitation those noted above, Plaintiff and Class Representative Chastity Marie was not aware of the existence of the Fund and the necessity of making a claim, let alone aware of the publication on the Fund's website of the covered recordings ready for distribution of Royalties, including "Commitment".  More than six months has now passed. Accordingly, pursuant to the Fund's Guidelines, and in the absence of judicial intervention,

Plaintiff and Class Representative Chastity Marie is unable to make a claim to receive her portion of the Royalties for "Commitment," to which she contributed her time and talent.  Ms. Marie is a regularly performing vocalist who is likely to be owed Royalties in the future but be unable to recover payment of them given the unlikelihood that she would find out about the Fund's publication of the lists in time to make a claim within 45 days of their publication.

<u>Clayton Pritchard</u>

64.     Plaintiff and Class Representative Clayton Pritchard is owed Royalties for, among other recordings, "Going Down For Real" ("GDFR") by Flo Rida since 2015. However, the Fund's Guidelines provide only 45 days to make a claim after publication of the lists by the Fund and that Royalties unclaimed after six months "revert" to the Fund.  Given the Trustees' acts and omissions, including without limitation those noted above, Plaintiff and Class Representative Clayton Pritchard was not aware of the existence of the Fund and the necessity of making a claim, let alone aware of the publication on the Fund's website of the covered recordings ready for distribution of Royalties, including "GDFR".  More than six months has now passed. Accordingly, pursuant to the Fund's Guidelines, and in the absence of judicial intervention, Plaintiff and Class Representative Clayton Pritchard is unable to make a claim to receive his portion of the Royalties for "GDFR," to which he contributed his time and talent.  Mr. Pritchard is a regularly performing musician who is likely to be owed Royalties in the future but be unable to recover payment of them given the unlikelihood that he would find out about the Fund's publication of the lists in time to make a claim within 45 days of their publication.

**<u>CLASS ALLEGATIONS</u>**

65.      Plaintiffs seek to represent the following Class:

> All persons residing in the United States of America who contributed as non-featured artists to sound recordings for which

SoundExchange has collected digital performance royalties and remitted Royalties to the Fund and who have not, in turn, received from the Fund the Royalties to which they are entitled under 17 U.S.C. § 114(g)(2)(B) & (C), regardless of whether they are union members.

The Class Period will run from the date the Fund was originally formed on September 16, 1998, until the date the Class is certified.

66.     There are tens of thousands of members of the Class, such that joinder of all Class members is impracticable. This is evidenced by the fact that the yearly unclaimed Royalties list of names posted by the Fund on its website typically contains thousands of names.

67.     There are questions of law and fact that are common to all of the members of the Class, including whether the Trustees owe fiduciary duties to the Class, whether the Trustees have breached their fiduciary duties by failing to pay Royalties to the Class and whether the Royalties ought to be, in equity and good conscience, paid to the Class.

68.     Plaintiffs' claims are typical of the claims of the Class. They all arise under the same legal theories and out of the same pattern of conduct by the Trustees.

69.     Plaintiffs will fairly and adequately represent and protect the interests of the Class because they have no conflicts of interest with the other members of the Class and because they have hired well-qualified counsel to represent the Class.

70.     This case is properly maintainable as a class action under Rule 23(b)(1), (2) & (3) of the Federal Rules of Civil Procedure because: (1) the prosecution of separate actions by individual Class members would create a risk of incompatible standards of conduct for the Trustees; (2) the Trustees have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole; and (3) the questions of law or fact common to Class members predominate over any questions affecting only individual members and a class action is superior

to other available methods for fairly and efficiently adjudicating the controversy. There will be no unusual difficulties in managing the Class. A well-designed notice plan can give effective notice to all members of the Class. And, the very equitable/declaratory/injunctive relief sought by Plaintiffs and the Class against the Trustees, if granted by the Court, will make identification of and payments to the members of the Class possible. Significantly, the amounts owed to each Class member can be mechanically and ministerially calculated based upon information already in the possession of the Trustees.

**FIRST CLAIM FOR RELIEF - BREACH OF FIDUCIARY DUTY FOR FAILURE TO DISTRIBUTE ROYALTIES TO PLAINTIFFS AND THE CLASS**

71. Plaintiffs incorporate the preceding and subsequent allegations as if fully set forth here verbatim, including without limitation the factual allegations contained in paragraphs 14 through 70 above.

72. The Trustees are fiduciaries in regard to the Fund pursuant to, among other authorities, N.Y. Est. Powers & Trusts Law § 1-2.7, 17 U.S.C. §114(g)(2)(B) & (C), and the Trust Agreement. Plaintiff and the Class are beneficiaries of the Fund. As fiduciaries, the Trustees owe to Plaintiffs and the Class, as beneficiaries, fiduciary duties of loyalty, reasonableness and good faith, diligence and prudence, to act solely in the interest of Plaintiffs and the Class and to treat the union and non-union members of the Class impartially, all of which duties cannot be disclaimed by private agreement between the Trustees, including by the provisions of the Trust Agreement.

73. The Trustees control substantial Royalties (likely in excess of $100 million) that are owed by statute, implementing regulations, the Trust Agreement, and applicable law to Plaintiffs and the Class. This money belongs to Plaintiffs and the Class, not to the Fund or the Trustees. Furthermore, Plaintiffs and the Class reasonably expect that the Trustees will in the

future collect additional Royalties owed to them and that the Trustees will likewise fail to distribute those Royalties to them.

74.     As set forth above in detail, by failing to make any real efforts to distribute the Royalties to Plaintiffs and the Class, the Trustees have effectively refused to distribute to Plaintiffs and the Class the Royalties owed to them, including the $100 million plus in Royalties currently held in the Fund's accounts.  As also set forth above, the Trustees have done so in order to benefit the Unions, dual employees of the Fund and the Unions and the members of the Unions.

75.     This refusal of the Trustees to pay the Royalties to Plaintiffs and the Class constitutes breach by the Trustees of their fiduciary duties of loyalty, reasonableness and good faith, diligence and prudence, and to act solely in the interests of Plaintiffs and the Class, who are the beneficiaries of the Fund.  In addition, because the Trustees' refusal results from their non-independence and their preference that Plaintiffs and the non-union members of the Class not receive the Royalties to which they are entitled, the Trustees' refusal also constitutes a breach of their fiduciary duty to treat the beneficiaries of the Fund impartially.  The Trustees' breaches of their fiduciary duties have proximately caused damages to Plaintiffs and the Class in the amount of the Royalties owed to but not distributed to them, which they believe exceed $100 million.

76.     To the extent that any of the provisions of the Trust Agreement could be interpreted as providing discretion to the Trustees not to engage in the activities reasonably required to distribute the Royalties to Plaintiffs and the Class, such provisions are not enforceable under New York law.  Alternatively, to the extent that such provisions may grant discretion to the Trustees, the Trustees have nevertheless breached their fiduciary duties owed to Plaintiffs and the Class because their complete failure to make any real attempt to identify

Plaintiffs and the Class and deliver the Royalties to them constitutes willful misconduct, bad faith and abuse of such discretion.

77.     As a remedy, Plaintiffs and the Class seek several layers of equitable/declaratory/injunctive relief.  First, they seek an accounting from the Trustees of all Royalties they have ever received from SoundExchange and of all expenditures they have ever made out of those Royalties, including all payments made to non-featured artists.  Second, Plaintiffs and the Class seek a judgment from the Court requiring the Trustees to engage in specified activities designed to identify as many of the Class members as possible and obtain their necessary information and pay to them the Royalties they are owed.  Those specified activities will be the subject of evidence presented to this Court, but likely will include, as set forth above in detail:  (1) paying for the necessary manpower to conduct and then conducting the necessary research regarding the identities and necessary information of the members of the Class, and (2) hiring marketing/advertising consultants to design and implement a national multi-media campaign designed to reach as many of members of the Class as possible and make known to them the availability of the Royalties, the Fund's publication of lists of covered recordings and non-featured artists eligible for payment of Royalties, and the necessity of and procedures for non-featured artists to review those lists and make claims for the Royalties owed to them.  Those activities will also include rescinding existing polices and setting new policies regarding the publication of the lists and the time periods and methods for making claims by non-featured artists that do not unreasonably prevent them from successfully making claims, as discussed above.

78.     The third layer of equitable relief sought by Plaintiffs and the Class is a judgment by the Court requiring the Trustees to make additional pro rata distributions out of any funds that

cannot be distributed despite full compliance by the Trustees with the Court's judgment regarding distribution of the Royalties currently held by the Trustees to those Plaintiffs and Class members who have been successfully paid. The ultimate goal of this relief is that the Trustees will distribute 100% of the Royalties that they currently hold to Plaintiffs and the Class. Fourth, and finally, Plaintiffs and the Class seek a judgment requiring the Trustees in connection with their future collection of Royalties from SoundExchange and distribution of them to Plaintiffs and the Class to continue the same practices used to distribute the currently held Royalties and to engage in additional activities designed to ensure identification of eligible Plaintiffs and Class members and payment of Royalties to them. Those additional requirements will also be the subject of evidence presented to the Court. Those additional activities will likely include, as described in detail above, the Trustees arranging with SoundExchange, recording studios, record labels and producers, and software distributors to make it possible to actually collect the identities of and the necessary information regarding non-featured artists at the time of their participation in the creation of sound recordings and to make such information easily available to the Trustees.

79.     To be clear, Plaintiffs and the Class seek a single judgment from the Court setting forth the obligations of the Trustees going forward, after which the Trustees will be obligated to follow the judgment. Plaintiffs and the Class do not request the Court to be involved in supervising the Trustees. The Court's involvement with the case will cease after entry of the judgment unless the Trustees fail to comply with it and Plaintiffs are forced to seek its enforcement by the Court.

80.     As an alternative to the equitable/declaratory/injunctive relief sought in order to cause the distribution of the unpaid Royalties currently held by the Trustees in the Fund,

Plaintiffs and the Class seek a judgment requiring the Trustees to pay out of the Fund as damages all of the unpaid Royalties currently held by the Trustees in the Fund to a special master for distribution to Plaintiffs and the Class.

81.    The Trustees have not clearly and openly repudiated their obligations as Trustees. Accordingly, no statute of limitations has ever begun to run on these breach of fiduciary duty claims of Plaintiffs and the Class.

82.    Alternatively, the Trustees' breaches of their fiduciary duties as described above constitute continuing wrongs that are not referable exclusively to the day the original wrongs were committed since the Trustees have had an ongoing duty to distribute all of the Royalties collected by the Fund.  Accordingly, the statute of limitations on these breach of fiduciary duty claims of Plaintiffs and the Class has been tolled and will not begin to run until the commission of the last wrongful act of the Trustees.

### SECOND CLAIM FOR RELIEF-MONEY HAD AND RECEIVED

83.    Plaintiffs incorporate the preceding and subsequent allegations as if fully set forth here verbatim, including without limitation the factual allegations contained in paragraphs 14 through 70 above.

84.    As set forth above, the Trustees have received and currently retain Royalties belonging to Plaintiffs and the Class in excess of $100 million.  The Trustees have benefited from receipt of that money because it allowed for the payment of expenses by the Fund and continuation of the operations of the Fund which benefitted the Unions' members who received Royalties.  The receipt of the money also benefited the Trustees because it benefitted their employers, the AFM and SAG-AFTRA, and key employees of the Fund who are also employees of the Unions or their affiliates as described above.

85.     Because the Royalties belong to Plaintiffs and the Class and because the Trustees have made no real effort to pay the Royalties to Plaintiffs and the Class, equity and good conscience require payment of the undistributed Royalties currently residing in the Fund's accounts and controlled by the Trustees to Plaintiffs and the Class.  This should be accomplished by payment of the Royalties out of the Fund to a special master for distribution to Plaintiffs and the Class.

86.     No contract exists between the Trustees and Plaintiffs and the Class.  The Trust Agreement does not constitute such a contract.  Accordingly, there is no bar to recovery in quasi-contract by Plaintiffs and the Class.

87.     The Trustees collected Royalties on an annual basis that they were obligated to distribute to Plaintiffs and the Class and other Fund beneficiaries.  On an annual basis, the Trustees disbursed Royalties to some beneficiaries, but not to Plaintiffs and the Class.  Under New York law, the statute of limitations for money had and received as to the Royalties collected but not disbursed in a given year began to run for each year on the date the Trustees disbursed Royalties to other beneficiaries but not to Plaintiffs and the Class.

## DEMAND FOR JURY

Plaintiffs request trial by jury of all issues in the case which can be tried to a jury, and they paid any required jury fee at the same time they paid the fee for filing the Original Complaint.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs Jon Blondell, Paul Harrington, Timothy Johnson, Stephanie Lowe, f/k/a Stephanie Marie, Chastity Marie, and Clayton Pritchard, individually and on behalf of the Class described above, respectfully request the following relief against the Trustees:

1.      An order certifying this case to proceed as a class action pursuant to Federal Rule

of Civil Procedure 23, appointing Plaintiffs as Class Representatives and appointing Plaintiffs'

counsel as Class Counsel;

2.      A judgment awarding the equitable/declaratory/injunctive relief set forth above;

3.      A judgment awarding the damages set forth above;

4.      A judgment awarding Plaintiffs their costs and expenses;

5.      A judgment awarding Plaintiffs and the Class pre-judgment and post-judgment

interest at the maximum rates permitted at law or in equity; and

6.      A judgment awarding Plaintiffs and the Class all such other and further relief,

general or special, legal or equitable, to which they are justly entitled.

Respectfully submitted,


/s/ *Roger L. Mandel*
Roger L. Mandel
Texas Bar No. 12891750
rlm@lhlaw.net
Bruce E. Bagelman
Texas Bar No. 01509700
beb@lhlaw.net

LACKEY HERSHMAN, L.L.P.
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone:      (214) 560-2201
Telecopier:      (214) 560-2203

-and-

Kieran M. Corcoran
New York Bar No. 2699015
kmc@lhlaw.net

LACKEY HERSHMAN, L.L.P.
1325 Avenue of the Americas
27th Floor
New York, NY  10019
(t) (212) 763-8491
(f) (212) 763-8304

-and-

Eric Zukoski,
Texas Bar No. 24010509
ezukoski@qslwm.com
James H. Birch,
Texas Bar No. 00797991
jbirch@qslwm.com

QUILLING, SELANDER, LOWNDS,
WINSLETT AND MOSER, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100
(214) 871-2111 (facsimile)

ATTORNEYS FOR PLAINTIFFS
JON BLONDELL, PAUL HARRINGTON,
TIMOTHY JOHNSON, STEPHANIE
LOWE FKA STEPHANIE MARIE,
CHASTITY MARIE, AND CLAYTON
PRITCHARD, INDIVIDUALLY AND ON
BEHALF OF A CLASS OF SIMILARLY
SITUATED PERSONS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 24th day of April, 2017, a true and correct copy of the above and foregoing pleading was served via ECF and electronic mail upon the following:

Jared O. Freedman
Erica L. Ross
jfreedman@jenner.com
eross@jenner.com
Jenner & Block LLP
1099 New York Ave. NW, Suite 900
Washington, DC  20001


_/s/_ Roger L. Mandel
　　　Roger L. Mandel

# Exhibit A

# AGREEMENT AND DECLARATION OF TRUST

**AFM and SAG-AFTRA**
**Intellectual Property Rights Distribution Fund**

**Established**
**September 16, 1998**

**Amended and Restated**
**July 26, 2012**

THIS AGREEMENT AND DECLARATION OF TRUST is made and entered into as of the 16th day of September, 1998, and is amended and restated as of July 26, 2012, in the City of New York, State of New York, by and between the American Federation of Musicians of the United States and Canada, AFL-CIO-CLC ("AFM") and the Screen Actors Guild - American Federation of Television and Radio Artists ("SAG-AFTRA"), hereinafter jointly known as the Unions.

## Preamble

WHEREAS, this Agreement and Declaration of Trust was originally established as of the 16th day of September, 1998, in the City of New York, State of New York, by and between the AFM and the American Federation of Television and Radio Artists ("AFTRA"); and

WHEREAS AFTRA merged with the Screen Actors Guild ("SAG") effective March 2012, and the merged unions are now constituted as SAG-AFTRA; and

WHEREAS, the Trustees now desire to amend and restate the Agreement and Declaration of Trust to reflect the merger of AFTRA into the merged union SAG-AFTRA, as well as to incorporate other amendments that the Trustees have made from time to time; and

WHEREAS, the Unions or their designated entities obtain and distribute to artists royalties and remuneration that are created by U.S. or foreign law and that are appropriate for collective administration; and

WHEREAS, the Unions have entered into a Reciprocal Agreement and an Annex for the Distribution of Record Rental Royalties Collected in Japan, pursuant to which they will receive and distribute record rental remuneration payable to non-featured instrumentalists and vocalists under the law of Japan; and

WHEREAS, the Unions have entered into other such agreements for the receipt and distribution of royalties or remuneration for the benefit of their members and other performing artists in the United States and Canada, and will continue to enter into such agreements; and

WHEREAS, to accomplish this purpose the Unions established a trust fund known as the AFM and AFTRA Intellectual Property Rights Distribution Fund for receiving and

1

distributing royalties and remuneration; and

WHEREAS, the trust fund formerly known as the AFM and AFTRA Intellectual Property Rights Distribution Fund shall now be known as the AFM and SAG-AFTRA  Intellectual Property Rights Distribution Fund; and

WHEREAS, the Unions desire to restate the terms and conditions under which the said Fund is to be established and administered;

NOW, THEREFORE, in consideration of the premises, it is mutually understood and agreed as follows:

### Article I
### Definitions

*Section 1.*  UNIONS.  The term "Unions" as used herein shall mean the American Federation of the Musicians of the United States and Canada, AFL-CIO-CLC, and the Screen Actors' Guild -- American Federation of Television and Radio Artists.

*Section 2.*  AFM.  The term "AFM" as used herein shall mean the American Federation of Musicians of the United States and Canada, AFL-CIO-CLC.

*Section 3.*  SAG-AFTRA.  The term "SAG-AFTRA" as used herein shall mean the Screen Actors Guild -- American Federation of Television and Radio Artists, or, prior to March 2012, the American Federation of Television and Radio Artists.

*Section 4.*  AGREEMENT AND DECLARATION OF TRUST.  The term "Agreement and Declaration of Trust" as used herein shall mean this instrument including any amendments hereto and modifications hereof.

*Section 5.*  FUND.  The term "Fund" as used herein shall mean the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund.

*Section 6.*  AGREEMENT FOR THE RECEIPT AND DISTRIBUTION OF REMUNERATION.  The term "agreement for the receipt and distribution of remuneration" as used herein shall mean any agreement entered into by the AFM, SAG-AFTRA or the Unions with a collecting society, rights organization or other appropriate entity to receive royalties or remuneration held by that entity and to distribute such royalties and remuneration to eligible artists.

*Section 7.*  ARTISTS.  The term "artists" as used herein shall mean instrumental musicians and vocalists.

### Article II
### Creation of Fund

*Section 1.*  ESTABLISHMENT OF FUND.  The AFM and AFTRA Intellectual Property Rights Distribution Fund, which was established on September 16, 1998. is hereby amended and restated as the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund, to be used for the

2

purpose set forth in this Agreement and Declaration of Trust.

*Section 2.* GENERAL PURPOSE. The Fund shall be a trust fund and shall be used for the purpose of receiving and distributing royalties or remuneration to artists in accordance with such agreements for receipt and distribution of remuneration as are entered into by the Unions with the relevant collecting societies, rights organizations or other appropriate entities. The Fund shall further provide the means for financing the expenses of the Trustees and the operation and administration of the Fund, in accordance with this Agreement and Declaration of Trust. The Fund is intended to satisfy the requirements of section 501(c)(6) of the Internal Revenue Code and shall be construed in all respects consistently with section 501(c)(6).

### Article III
### Trustees

*Section 1.* AFM AND SAG-AFTRA TRUSTEES. The operation and administration of the Fund shall be the joint responsibility of six Trustees, three appointed by the AFM, of which no fewer than one shall be a rank-and-file representative, and three appointed by SAG-AFTRA, of which no fewer than one shall be a rank-and-file representative.

*Section 2.* TERM OF TRUSTEES. Each Trustee shall continue to serve as such until his or her death, incapacity, resignation, or removal by the appointing Union. Each Union may remove or replace its Trustee at will.

*Section 3.* SUCCESSOR TRUSTEES. Each Union shall appoint its successor Trustees.

*Section 4.* FORM OF NOTIFICATION. In case any Trustee shall be removed, replaced, or succeeded, a statement in writing by the relevant Union shall be sufficient evidence of its action, when forwarded to the Fund and to the remaining Trustees. Any resignation shall be evidenced in writing and forwarded by registered mail to the Fund and the remaining Trustees, and shall not be effective for two months following the date of mailing unless a successor Trustee has been appointed.

### Article IV
### Powers, Duties and Obligations of Trustees

*Section 1.* PROPERTY AND ASSISTANCE. The Trustees are authorized and empowered to lease or purchase such premises, materials, supplies and equipment, and to hire, employ and retain such legal counsel, investment advisor, administrative, accounting, actuarial, clerical and other assistants or employees as in their discretion they may find necessary or appropriate in the performance of their duties.

*Section 2.* CONSTRUCTION OF AGREEMENT. The Trustees shall have power to construe the provisions of this Agreement and Declaration of Trust and the terms used herein, and any construction adopted by the Trustees in good faith shall be binding upon the AFM, SAG-AFTRA, and artists claiming benefits under the Fund.

*Section 3.* GENERAL POWERS. The Trustees are hereby empowered, in addition to other such powers as are set forth herein or conferred by law:

3

A.      To establish and administer the Fund on behalf of artists who may be entitled to payments pursuant to agreements for the receipt and distribution of remuneration entered into by the AFM, SAG-AFTRA or the Unions and determined by the Trustees to be appropriate for administration by the Fund.

B.      As to each agreement for the receipt and distribution of remuneration recommended by the AFM, SAG-AFTRA or the Unions, to decide whether or not to administer the agreement through the Fund.

C.      As to each agreement for the receipt and distribution of remuneration which is to be administered through the Fund, to establish governing rules and procedures for the distribution that are consistent with the relevant agreement.

D.      As to each agreement for the receipt and distribution of remuneration which is to be administered through the Fund, to pay all expenses necessary to the establishment, administration and operation of the agreement out of the receipts generated by the agreement.

E.      To enter into any and all contracts and agreements for carrying out the terms of this Agreement and Declaration of Trust and for the administration of the Fund and do all acts as they, in their discretion, may deem necessary and advisable.

F.      To compromise, settle, arbitrate, and release claims or demands in favor of or against the Fund or the Trustees on such terms and conditions as the Trustees may deem advisable.

G.      To establish and accumulate as part of the Fund a reserve or reserves, adequate, in the opinion of the Trustees, to carry out the purposes of the Fund.

H.      To pay out of the Fund all real and personal property taxes, income taxes and other taxes of any and all kinds levied or assessed under existing or future laws upon or in respect to the Fund or any money, property, or securities forming a part thereof.

I.      To make appropriate allocations of common administrative expenses and disbursements shared or to be shared with any other Plan or Fund, or among the various agreements for the receipt and distribution of remuneration.

J.      To receive contributions, payments, distributions or transfers from any source whatsoever to the extent permitted by law.

K.      To establish advisory committees composed of AFM and SAG-AFTRA representatives and/or other artists or artists' representatives, and to set forth the duties and functions of the members of such advisory committees.

L.      To do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary or proper for the protection of the property held hereunder.

4

M.      To establish such bank account or accounts as the Trustees deem necessary in their discretion, including escrow accounts pending the adoption of distribution rules governing the administration of an agreement for the receipt and distribution of remuneration.

N.      To do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary to accomplish the general objective of distributing remuneration to eligible artists in the most efficient and economical manner.

O.      To purchase or obtain from the AFM, SAG-AFTRA, the AFM and Employers' Pension Fund, the AFTRA Health and Retirement Funds, the Phonograph Manufacturers' Special Payments Fund, the Motion Picture Special Payments Fund or any commercial source any data helpful for the identification and location of artists eligible for remuneration or the identification of recorded or other performances covered by an agreement for the receipt and distribution of remuneration.

P.      To invest the assets of the Fund with care, skill, prudence and diligence under circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of a like character and with such aims, without regard to state law restrictions on investments.

*Section 4.*  COMPENSATION. The Trustees shall not receive compensation for the performance of their duties.

*Section 5.*  PERSONAL LIABILITY. Neither the Trustees nor any individual or successor Trustee shall be personally answerable or personally liable for any liabilities or debts of the Fund contracted by them as Trustees, or for the non-fulfillment of contracts, but the same shall be paid out of the Fund and the Fund is hereby charged with a first lien in favor of such Trustee for indemnification for any amounts paid out by any such Trustee for any such liability and for indemnification against any liability of any kind which the Trustees or any of them may incur hereunder; provided, however, that nothing herein shall exempt any Trustee from liability arising out of his own willful misconduct, bad faith or gross negligence, or entitle such Trustee to indemnification for any amounts paid or incurred as a result thereof.

The Trustees and each individual Trustee shall not be liable for any error of judgment or for any loss arising out of any act or omission in the execution of their duties so long as they act in good faith and without gross negligence; nor shall any Trustee, in the absence of his own willful misconduct, bad faith or gross negligence, be personally liable for the acts or omissions (whether performed at the request of the Trustees or not) of any other Trustee, or of any agent or attorney elected or appointed by or acting for the Trustees.

The Trustees shall be fully protected in acting upon any instrument, certificate, or paper believed by them to be genuine and to be signed or presented by the proper person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements contained therein.

5

Neither the AFM nor SAG-AFTRA shall in any way be liable in any respect for any of the acts, omissions or obligations of the Trustees, individually or collectively,

The Trustees may from time to time consult with legal counsel and shall be fully protected in acting upon such advice of counsel to the Fund as respects legal questions.

*Section 6.*  BOOKS OF ACCOUNT.  The Trustees shall keep true and accurate books of account and records of all their transactions, which shall be audited at least annually by a certified public accountant selected by the Trustees. Such audits shall be available at all times for inspection by the AFM and SAG-AFTRA.

*Section 7.*  EXECUTION OF DOCUMENTS.  The Trustees may authorize and designate an employee or agent of the Fund to execute any notice or other instrument in writing.

*Section 8.*  DEPOSIT AND WITHDRAWAL OF FUNDS.  All moneys received by the Trustees hereunder shall be deposited by them in such bank or banks as the Trustees may designate for that purpose, and all withdrawals of moneys from such account or accounts shall be made only by checks signed by the Trustees, except that the Trustees may, in their discretion, designate and authorize an employee or agent of the Fund to sign checks upon such separate and specific bank account or bank accounts as the Trustees may designate and establish for such purpose.

*Section 9.*  SURETY BONDS.  The Trustees and any employees of the Trustees who are empowered and authorized to sign checks as aforesaid shall each be bonded by a duly authorized surety company in such amounts as may be determined from time to time by the Trustees. Each such employee employed by the Trustees who may be engaged in handling moneys of the Trust Fund shall also be bonded by a duly authorized surety company in the same manner. The cost of the premium on such bonds shall be paid out of the Fund.

### Article V
### Selection of Remuneration Systems to Be Administered by the Fund

*Section 1.*  ACCEPTANCE FOR ADMINISTRATION THROUGH THE FUND.  As to each agreement for the receipt and distribution of remuneration entered into by the AFM, SAG-AFTRA, or the Unions jointly, and referred by one of them to the Trustees for their consideration, the Trustees, in their sole discretion, may decide whether or not the agreement is appropriate for administration through the Fund. An agreement will be accepted for administration through the Fund only if the Trustees, voting in accordance with Article VII, Section 3, agree to accept it. The refusal of the AFM or SAG-AFTRA to accept an agreement for administration by the Fund shall not be subject to arbitration. The acceptance of an agreement for administration by the Fund shall be in writing.

*Section 2.*  HOLDING MONEY PENDING ACCEPTANCE FOR ADMINISTRATION.  The Fund may hold moneys received pursuant to an agreement for the receipt and distribution of remuneration in an escrow account pending the Trustees' decision whether to accept the agreement for administration through the Fund. If the Trustees refuse acceptance, the moneys will be returned with any interest accumulated thereon and minus any administrative costs incurred to the AFM, SAG-AFTRA or the Unions jointly in accordance with the agreement for the receipt and distribution of remuneration.

6

*Section 3*. CONTINUATION OF ADMINISTRATION. Once an agreement for the receipt and distribution of remuneration has been accepted for administration through the Fund, it shall continue to be administered through the Fund until such time as the Trustees, voting in accordance with Article VII, Section 3, agree that such administration is no longer appropriate. If the Trustees, voting in accordance with Article VII, Section 3, disagree over whether continued administration is appropriate, they will attempt to resolve their difference on the matter. If they cannot resolve their difference on the matter, they agree to submit the dispute to mediation administered by the American Arbitration Association. If mediation fails to resolve the dispute, the agreement for the receipt and distribution of remuneration shall be discontinued for administration through the Fund upon the vote of the Trustees for one Union, voting in accordance with Article VII, Section 3.

### Article VI
### Plan of Payments and Distributions

*Section 1*. PAYMENTS. The Trustees shall have full authority to determine all questions of the nature and amount of payments to be provided to artists consistent with the relevant agreements for the receipt and distribution of remuneration.

*Section 2*. ELIGIBILITY FOR PAYMENTS. The Trustees shall have full authority to determine eligibility requirements for payments, consistent with the relevant agreements for the receipt and distribution of remuneration, and to adopt rules and regulations setting forth the same, which shall be binding on the artists.

*Section 3*. METHOD OF PROVIDING PAYMENTS. The payments shall be provided and maintained by such means as the Trustees in their sole discretion shall determine.

*Section 4*. WRITTEN PLAN OF PAYMENTS AND DISTRIBUTIONS. The detailed basis upon which payments are to be made pursuant to each agreement for the receipt and distribution of remuneration shall be specified in writing by appropriate action of the Trustees subject, however, to such changes or modifications by the Trustees from time to time as they in their discretion may determine. All such changes or modifications shall similarly be specified in writing by appropriate resolution of the Trustees.

*Section 5*. DETERMINING CLAIMS FOR PAYMENTS. The Trustees shall have full authority to determine all claims for payments, provided that they may delegate to the duly designated administrators of the Fund authority to determine such claims initially. The administrators' initial determination shall be submitted to the Trustees for final determination. An individual who believes that he or she has been adversely affected by the administrators' or Trustees' determinations regarding payment of benefits may submit a written appeal to the Trustees. The decision of the Trustees shall be final.

### Article VII
### Meetings and Decision of Trustees

*Section 1*. MEETING OF TRUSTEES. Meetings of the Trustees shall be held at such place or places as may be agreed upon by the Trustees.

7

*Section 2.*  ACTION BY TRUSTEES WITHOUT MEETING.  The Trustees may also take action in writing without a meeting.

*Section 3.*  AGREEMENT OF THE TRUSTEES.  All actions of the Trustees shall be by agreement, with the AFM Trustees casting one vote, and the SAG-AFTRA Trustees casting one vote. In the event that any matter presented for decision cannot be decided because of a failure of agreement, the matter may be submitted for arbitration in accordance with Article VIII.

*Section 4.*  MINUTES OF MEETINGS.  The Trustees shall keep minutes of all meetings but such minutes need not be verbatim.

**Article VIII**
**Arbitration**

*Section 1.*  APPLICATION OF THIS ARTICLE.  A Trustee may apply to the American Arbitration Association in the area where the Fund maintains its principal office for the designation of an arbitrator who will decide any disputes between the Trustees or any other matter submitted to arbitration in accordance with the provisions of Article VII, Section 3. The decision of the arbitrator shall be final and binding. Decisions to accept an agreement for the receipt and distribution of remuneration for administration through the Fund, pursuant to Article V, Section 1, shall not be subject to arbitration.

*Section 2.*  EXPENSES OF ARBITRATION.  The cost and expense incidental to any arbitration proceeding, including the fee, if any, of the impartial arbitrator, shall be a proper charge against the Fund and the Trustees are authorized and directed to pay such charges.

**Article IX**
**Execution of Trust Agreement**

*Section 1.*   COUNTERPARTS.  This Trust Agreement may be execute in counterparts.

**Article X**
**Amendment to Trust Agreement**

*Section 1.*  AMENDMENT BY TRUSTEES.  This Agreement and Declaration of Trust may be amended in any respect from time to time by the Trustees, provided that each amendment shall be duly executed in writing by the Trustees and annexed hereto. The Trustees shall have full discretion to fix the effective date of any amendment.

**Article XI**
**Termination of Trust**

*Section 1.*  BY THE TRUSTEES.  This Agreement and Declaration of Trust may be terminated by an instrument in writing executed by the Trustees when there is no longer in force and effect an agreement for the receipt and distribution of remuneration which is accepted for administration by the Fund.

*Section 2.*  PROCEDURE ON TERMINATION.  In the event of the termination of this Agreement and Declaration of Trust, the Trustees shall apply the Fund to pay or to provide for the payment

8

of any and all obligations of the Fund and shall distribute and apply any remaining surplus in such a manner as will in their opinion best effectuate the purpose of the Fund; provided, however, that no part of the corpus or income of said Fund shall be used for or diverted to purposes other than for the benefit of the artists eligible for benefits under the agreements for the receipt and distribution of remuneration administered by the Fund, or the administrative expenses of the Fund or other payments in accordance with the provisions of the Fund.

*Section* 3. NOTIFICATION OF TERMINATION. Upon termination of the Fund, the Trustees shall notify each necessary party, and the Trustees shall continue as Trustees for the purpose of winding up the affairs of the Trust.

## Article XII
### Miscellaneous Provisions

*Section 1.* GOVERNING LAW. This Agreement and Declaration of Trust shall be construed under the laws of the State of New York applicable to contracts made and to be performed within the County and State of New York (without regard to any conflict of laws provision), and venue for any dispute arising under this Agreement and Declaration of Trust shall be in New York.

*Section 2.* NOTIFICATION TO TRUSTEES. The address of each of the Trustees shall be that stated on the signature page of this Agreement and Declaration of Trust. Any change of address shall be effected by written notice to the Trustees.

*Section 3.* SEVERABILITY. Should any provision in this Trust Agreement or in the rules and regulations adopted thereunder be deemed or held to be unlawful or invalid for any reason, such fact shall not adversely affect the provisions contained therein unless such illegality shall make impossible or impractical the functioning of the Trust and the Plan, and in such case the appropriate parties shall immediately adopt a new provision to take the place of the illegal or invalid provision.

*Section 4.* VESTED RIGHTS. No artist or any person claiming by or through such artist, including the artist's family, dependents, beneficiary and/or legal representative, shall have any right, title or interest in or to the Fund or any property of the Fund or any part thereof except as may be specifically determined by the Trustees.

*Section 5.* ENCUMBRANCE OF PAYMENTS. No moneys, property or equity, of any nature whatsoever, in the Fund, or policies or benefits or moneys payable therefrom, shall be subject in any manner by any artist or person claiming through such artist to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, garnishment, mortgage, lien or charge, and any attempt to cause the same to be subject thereto shall be null and void.

*Section 6.* EXPENSES OF THE TRUSTEES. All expenses of the Trustees incurred in the performance of their duties may be chargeable to the Fund at the discretion of the Trustees. All other expenses incurred pursuant to Article IV hereof shall be paid by the Fund.

*Section 7.* NO EMPLOYER CONTRIBUTIONS PERMITTED. The Fund shall not accept contributions from any employer or association of employers who employ artists represented by the AFM or SAG-AFTRA, and shall not enter into agreements for the receipt and distribution of remuneration with

9

such employers or associations of employers.

IN WITNESS HEREOF, in accordance with Article X, the Trustees sign this Agreement and Declaration of Trust, which amends and restates the original agreement and declaration of trust. The Trustees, by affixing their signatures at the end of this Agreement and Declaration of Trust, agree to accept the trusteeship and act in their capacity strictly in accordance with the provisions of this Agreement and Declaration of Trust.

Raymond M. Hair, Jr., AFM          Date
1501 Broadway, Suite 600
New York, NY 10036

Duncan Crabtree-Ireland, SAG-AFTRA   Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

Sam Folio, AFM          Date
1501 Broadway, Suite 600
New York, NY 10036

Stefanie Taub, SAG-AFTRA          Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

Bruce Bouton, AFM          Date
1501 Broadway, Suite 600
New York, NY 10036

Jon Joyce, SAG-AFTRA          Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

10

such employers or associations of employers.

IN WITNESS HEREOF, in accordance with Article X, the Trustees sign this Agreement and Declaration of Trust, which amends and restates the original agreement and declaration of trust. The Trustees, by affixing their signatures at the end of this Agreement and Declaration of Trust, agree to accept the trusteeship and act in their capacity strictly in accordance with the provisions of this Agreement and Declaration of Trust.

| | | |
|---|---|---|
| Raymond M. Hair, Jr., AFM   Date<br>1501 Broadway, Suite 600<br>New York, NY 10036 | | Duncan Crabtree-Ireland, SAG-AFTRA   Date<br>5757 Wilshire Boulevard, 7th Floor<br>Los Angeles, CA 90036 |
| Sam Folio, AFM   Date<br>1501 Broadway, Suite 600<br>New York, NY 10036 | | Stefanie Taub, SAG-AFTRA   Date   11/13/12<br>5757 Wilshire Boulevard, 7th Floor<br>Los Angeles, CA 90036 |
| Bruce Bouton, AFM   Date<br>1501 Broadway, Suite 600<br>New York, NY 10036 | | Jon Joyce, SAG-AFTRA   Date<br>5757 Wilshire Boulevard, 7th Floor<br>Los Angeles, CA 90036 |

10

such employers or associations of employers.

IN WITNESS HEREOF, in accordance with Article X, the Trustees sign this Agreement and Declaration of Trust, which amends and restates the original agreement and declaration of trust. The Trustees, by affixing their signatures at the end of this Agreement and Declaration of Trust, agree to accept the trusteeship and act in their capacity strictly in accordance with the provisions of this Agreement and Declaration of Trust.

Raymond M. Hair, Jr., AFM    Date
1501 Broadway, Suite 600    11/15/12
New York, NY  10036

Duncan Crabtree-Ireland, SAG-AFTRA   Date   1/18/13
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA  90036

Sam Folio, AFM    Date
1501 Broadway, Suite 600
New York, NY  10036

Stefanie Taub, SAG-AFTRA    Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA  90036

Bruce Bouton, AFM    Date
1501 Broadway, Suite 600
New York, NY  10036

Jon Joyce, SAG-AFTRA    Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA  90036

10