UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
JON BLONDELL, PAUL HARRINGTON, TIMOTHY
JOHNSON, STEPHANIE LOWE, F/K/A STEPHANIE
MARIE, CHASTITY MARIE, AND CLAYTON
PRITCHARD, individually and on behalf of a class of
similarly situated persons,

                      Plaintiffs,

      - against -

BRUCE BOUTON, DUNCAN CRABTREE-IRELAND,
AUGUSTINO GAGLIARDI, RAYMOND M. HAIR, JR.,
JON JOYCE, AND STEFANIE TAUB, in their official
capacities and individually,

                      Defendants.
--------------------------------------------------------------------X

**MEMORANDUM AND ORDER**
17-CV-372 (RRM) (RML)

ROSLYNN R. MAUSKOPF, United States District Judge.

      Plaintiffs Jon Blondell, Paul Harrington, Timothy Johnson, Stephanie Lowe, f/k/a

Stephanie Marie, Chastity Marie, and Clayton Pritchard, individually and on behalf of a class of

similarly situated persons (collectively, "plaintiffs"), bring this action for breach of fiduciary

duty against defendants Bruce Bouton, Duncan Crabtree-Ireland, Augustino Gagliardi, Raymond

M. Hair, Jr., Jon Joyce, and Stefanie Taub (collectively, "defendants"), as trustees of the AFM

and SAG-AFTRA Intellectual Property Rights Distribution Fund, principally alleging that

defendants failed to properly identify and pay plaintiffs royalties which defendants collected for

their benefit.  (*See* Second Am. Compl. ("SAC") (Doc. No. 48).)  Plaintiffs also allege claims for

money had and received against all defendants, in their official capacities.  In addition to class

certification, plaintiffs seek damages, attorneys' fees, and equitable, declaratory, and injunctive

relief requiring defendants to provide an accounting, and to adopt procedures to ensure royalties

are paid in the future.  Plaintiffs bring this action against defendants in their official capacities,

except that, to the extent defendants used Fund assets to pay for attorneys' fees and court expenses, plaintiffs seek to hold defendants liable in their individual capacities to reimburse the Fund for such fees. Before the Court is defendants' motion to dismiss, pursuant to Federal Rule of Civil Procedure ("Rule") 12(b). (Def. Mot. (Doc. No. 52).) For the reasons explained below, defendants' motion is denied.

## BACKGROUND[1]

### I. The Statutory Framework

The Copyright Act grants copyright owners of sound recordings the exclusive right to publicly perform their recordings "by means of digital audio services."[2] 17 U.S.C. § 106(6); *see also* (SAC ¶ 14). However, Congress also established a statutory license to allow certain digital services to perform copyrighted sound recordings, as long as they comply with the rates and terms of the license. *See id*. § 114 ("Section 114"); *see also* (SAC ¶ 14). For example, each time a song is played on the popular audio-streaming service Pandora, the individuals who contributed to the creation of the recording may be entitled to receive royalties, which often amount to a fraction of a penny per performance. (SAC ¶ 14.)

When relevant stakeholders cannot agree on royalty terms related to a digital music service, Section 114 provides for a panel of three judges, the Copyright Royalty Board ("CRB"), to set the statutory rate and terms through trial proceedings. *See* 17 U.S.C. § 114(f); *see also* (SAC ¶ 14). Copyright owners and performers are represented before the CRB by

---

[1] The following facts are taken from the second amended complaint unless otherwise noted. The Court also considers the Trust Agreement, (Ex. A to SAC (Doc. No. 48-1)), which is attached as an exhibit to the second amended complaint and incorporated in it by reference. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (The complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." (internal quotation marks omitted) (citations omitted)).

[2] In the context of the Copyright Act, public "performance" encompasses playing a song on an online streaming service or digital audio radio service, such as SiriusXM Radio. *See* 17 U.S.C. § 101.

SoundExchange, "the sole entity" in the United States authorized to collect royalties from statutory licensees.[3]  (SAC ¶ 14.)  SoundExchange is tasked with collecting royalties due under the statutory license and distributing 50 percent of the proceeds to copyright owners, and 45 percent to featured artists.  *See* 17 U.S.C. § 114(g)(2)(A), (D).  At issue in this case is the five percent remaining, which is allocated for "session" musician and vocalists (collectively, "non-featured performers").  *See id*. § 114(g)(2)(B), (C).  As defined by SoundExchange, a non-featured performer is "an artist who is not prominently featured on a track or album."[4]  Defendants are the trustees ("the Trustees") of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund ("the Fund"), charged with distributing the five percent of royalties owed to non-featured performers.  (SAC ¶ 15.)

Section 114 mandates that the five percent be divided equally between session musicians and session vocalists, and placed in "an escrow account managed by an independent administrator."  17 U.S.C. § 114(g)(2)(B), (C).  The Fund is the independent administrator, "jointly appointed by copyright owners of sound recordings" and two unions:  the American Federation of Musicians of the United States and Canada, AFL-CIO-CLC ("AFM"), and the Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA") (collectively, "the Unions"), as required by Section 114.  (SAC ¶ 16); *see also* 17 U.S.C. § 114(g)(2)(B), (C).  As the independent administrator, the Fund is tasked with receiving royalties allocated for non-featured performers from SoundExchange, and distributing them, just as SoundExchange does for copyright owners and featured artists.  (SAC ¶ 15.)

---

[3] SoundExchange is an affiliate and former subsidiary of the Recording Industry Association of America.  (SAC ¶ 14.)

[4] *See* SOUNDEXCHANGE, *General FAQs*, https://www.soundexchange.com/about/general-faqs/ (last visited Mar. 28, 2019).

Plaintiffs include both union and non-union non-featured artists who have performed as musicians and vocalists on sound recordings, satellite radio, cable television, and other digital services. (*Id*. ¶ 89.) In this action, plaintiffs allege that they have not received royalties they are legally entitled to, as a consequence of defendants' failure to properly administer the Fund. They seek to represent performers residing in the United States "who contributed as non-featured artists to sound recordings for which SoundExchange has collected Royalties and remitted them to the Fund and which the Fund designated as Covered Recordings[5] who have not, in turn, received from the Fund the Royalties to which they are entitled under 17 U.S.C. § 114(g)(2)(B) & (C), regardless of whether they are union members." (*Id*. ¶ 125.) At this stage in the litigation, defendants have paid some royalties to the named plaintiffs. However, plaintiffs maintain that they have not been paid in full, and that approximately 40,000 similarly situated non-featured performers, the intended beneficiaries of the Fund, have not received royalties they earned. (*Id*. ¶ 36.)

## II.    The Fund

The Unions formed the Fund in 1998 as a trust fund under New York law. (*Id*. ¶ 16.) The Fund is a non-profit organization operating pursuant to an agreement, (the "Trust Agreement"), executed by the Trustees and governed by New York law. (*See* Trust Agreement, Ex. A to SAC (Doc. No. 48-1) art. XII, § 1.) The purpose of the Fund is to receive and distribute "royalties or remuneration" to eligible artists, including those collected by SoundExchange and any other collection associations. (*Id*. art. II, § 2.) The Trust Agreement provides that AFM and SAG-AFTRA must each appoint three of the six trustees. (*Id*. art. III, § 1.) At least two trustees must be "rank-and-file" union members. (*Id*.) While Section 114 requires the Fund to pay

---

[5] "Covered Recordings" are sound recordings that the Fund determines are eligible for payment of royalties. (*See* SAC ¶ 20.)

eligible artists regardless of their union membership, currently all of the Trustees are union

members.  (SAC ¶ 17); *see also* 17 U.S.C. § 114(g)(2)(B), (C).

The Trust Agreement grants the trustees discretion in the exercise of their duties.  The

trustees have the "power to construe the provisions" of the Trust Agreement, and any "good

faith" construction is "binding upon . . . artists claiming benefits under the Fund."  (Trust

Agreement art. IV, § 2.)  The Trust Agreement empowers the trustees to do anything they "deem

necessary to accomplish the general objective" of the Fund "in the most efficient and economical

manner."  (*Id*. art. IV, § 3(N).)  The Trust Agreement also states that "[n]o artist . . . shall have

any right, title or interest in or to the Fund or any property of the Fund . . . except as may be

specifically determined by the Trustees."  (*Id.* art. XII, § 4.)  The trustees have "full authority to

determine eligibility requirements for payments . . . and to adopt rules and regulations . . . which

shall be binding on the artists."  (*Id*. art. VI, § 2.)  Accordingly, and as discussed below, the

Trustees have adopted guidelines addressing the distribution of royalties.[6]  (SAC ¶ 73.)

Plaintiffs contend that defendants fail to adhere to "the minimal requirements" of their own

guidelines, and that some of the guidelines are "counter-productive to the goal of distributing"

royalties, which "demonstrates the Trustees' bad faith."  (*Id*.)

The Fund's guidelines indicate that unclaimed royalties "shall revert to the Fund" after

six months.  (*Id*. ¶ 77.)  The record is not entirely clear on how the trustees are compensated.

The Trust Agreement states that the trustees are not compensated for administering the Fund,

(Trust Agreement art. IV, § 4), and in the second amended complaint, plaintiffs confirm that the

trustees "are not compensated by the Fund, but by their employers—the AFM and SAG-

---

[6] The record indicates that defendants adopted the guidelines, though the parties do not indicate when the guidelines were first published on the Fund's website.  (*See* Def. Mot. at 6.)  The Fund's website states that the guidelines were last amended on December 4, 2013.  *See Sound Recording Distribution Guidelines*, https://www.afmsagaftrafund.org/guidelines_SR.php (last visited Mar. 28, 2019).

AFTRA." (SAC ¶ 84.) At the same time, plaintiffs allege that the trustees are "are paid, at least in part, from the Royalties." (*Id*. ¶ 86.)

## III.    The Distribution of Royalties

The parties agree that defendants face a difficult task in distributing royalties. "Each year thousands of sound recordings are digitally performed," "[t]ens of thousands of non-featured artists perform on those sound recordings," and royalties for those thousands of songs "are remitted to the Fund." (*Id*. ¶ 20.) While the CRB issues regulations governing distribution to copyright owners and featured artists, no equivalent regulations exist to guide the Fund in distributing royalties to non-featured performers. *See, e.g.*, 37 C.F.R. § 380.4(a)(1). Thus, the trustees determine the method by which they distribute royalties, operating "free from any oversight." (SAC ¶ 19.)

To distribute royalties, the trustees first determine whether a recording is eligible for payment.[7] They then identify the non-featured performers that contributed to that recording and determine which artists are eligible for royalties. (*Id*. ¶ 20.) In order to make a distribution, the trustees must "ascertain the identities, addresses (or direct deposit information), and taxpayer identification numbers" of the artists. (*Id*. ¶ 24.) This information is not provided to the Fund, so the trustees are tasked with conducting research to locate tens of thousands of artists and obtain their payment information. (*Id*.) The Fund publishes a list on its website – the Unclaimed Royalties List – containing names of non-featured performers who are eligible for royalties, but for whom the Fund lacks the necessary information to remit payment. (*Id*. ¶ 37.) However, many artists are not aware that the Fund exists and, therefore, never visit its website. (*Id.* ¶ 26.)

---

[7] Not all sound recordings are eligible for payment because royalties are calculated according to frequency of digital performance; many recordings are performed a small number of times, and thus, payment for these performances "would not be efficient or desirable." (SAC ¶ 20.)

The Unclaimed Royalties List contains at least 40,000 names of artists who are collectively owed at least $54 million. (*Id.* ¶¶ 36, 43.)

Plaintiffs allege that by failing to make reasonable, good faith efforts to identify non-featured performers, defendants have "effectively refused to pay" the putative class the royalties owed to them. (*Id.* ¶ 135.) They point to the Fund's "abysmal performance" in paying the royalties as evidence of defendants' "bad faith refusal" to pay. (*Id.* ¶ 82.) While plaintiffs acknowledge the sheer volume of artists that defendants are tasked with locating, they argue that the Fund's research efforts are "grossly inadequate," and its failure to partner with third-parties to systematically collect information, and engage in sufficient marketing to promote awareness of the Fund, virtually guarantees that artists will not be paid. (*Id.* ¶ 29.) Plaintiffs allege that, given that "the sole purpose for the existence of the Fund is to distribute Royalties," defendants' deficient efforts amount to a breach of the "fiduciary duties of loyalty, reasonableness and good faith, diligence and prudence, to act solely in the interest of Plaintiffs and the Class, who are the beneficiaries of the Fund." (*Id.* ¶¶ 43, 136.)

Specifically, plaintiffs allege that although defendants conduct some research, their efforts do not meet the standard of reasonable, prudent trustees. (*Id.* ¶¶ 29–43.) In 2011, the Fund only employed two individuals to conduct research, which allegedly amounted to a "0% chance of obtaining necessary payment information" for thousands of artists. (*Id.* ¶ 36.) Until 2013, the Fund's research was years behind, and consisted of searching "basic websites" containing unreliable user-generated information and the Unions' databases, which plaintiffs claim guaranteed that any artists who were not members of the Unions would not be found. (*Id.* ¶¶ 24, 29, 30, 31.) The situation "improved marginally" after 2013, but even today, the Fund allegedly fails to undertake actions that a reasonable trustee would, such as obtaining CD liner

notes, contacting record labels or featured artists' management, hiring more researchers, and maximizing their use of Lexis Accurint, a service that the Fund subscribes to which contains social security numbers for millions of people.  (*Id*. ¶¶ 32, 33, 38, 40.)

Given that even exhaustive research will leave a large number of artists unidentified, plaintiffs contend that defendants must market the Fund so that it becomes well-known, and artists may then proactively identify themselves.  (*Id*. ¶ 44.)  The Fund's current practice of passively managing a website and intermittently publishing "[v]ague advertisements," largely in union publications, has not created "the necessary awareness" among artists that they are entitled to royalties.  (*Id*. ¶¶ 49, 59.)  Plaintiffs assert that the Fund must budget a minimum of $200,000 per year, or $5 per non-featured artist, for paid advertising to meet the standard of a prudent trustee – a manageable goal given that the Fund holds over $100 million in unpaid royalties.  (*Id*. ¶¶ 49, 135.)  The current budget is far below this alleged minimum; in 2015, the Fund collected $46,051,587 in receipts, and spent $38,341 on advertising.  (*Id*. ¶ 53.)  While the budget increased after plaintiffs filed a lawsuit, plaintiffs contend that the "marginal[]" improvement does "not come close to constituting a reasonable, good faith marketing campaign."  (*Id.* ¶¶ 50, 56.)  A reasonable effort would allegedly require, among other things, hiring a marketing consultant capable of spearheading "a coordinated effort across multiple marketing mediums, including print ads, digital ads, social media ads, email marketing, website, search engine optimization, public relations, and music industry outreach."  (*Id*. ¶ 47.)  While the Trustees hired a marketing manager in 2016, plaintiffs highlight the inability of the Fund to "obtain measurable results."  (*Id*. ¶¶ 56, 63.)

Plaintiffs further assert that the Fund's failure to at least attempt to engage certain third-parties to facilitate payments is unreasonable.  (*Id*. ¶¶ 64–72.)  Plaintiffs contend that

partnerships with third-parties aimed at systematic collection of information would be the "single best way to" ensure non-featured artists are paid. (*Id.* ¶ 64.) They provide examples of third-parties amenable to partnerships and information-sharing. (*Id.* ¶¶ 66–69.) While the Fund partners with the Unions, paying them for the right to search their databases, the Fund has never attempted to arrange an equivalent partnership with record labels or other entities that might have information on non-union artists. (*Id.* ¶¶ 64–65.) Plaintiffs allege that the Fund's "vastly greater success rate" at locating Union artists is one example of how the Trustees' relationship with the Unions constitutes a "significant conflict[] of interest," which jeopardizes Congress' desire for an independent administrator. (*Id.* ¶¶ 24, 84.) Plaintiffs assert that defendants "are anything but independent because they are all officers and employees and members of" the Unions. (*Id.* ¶ 84.) It is no coincidence, plaintiffs allege, that the Fund has a substantially higher success rate at compensating union artists, as the Trustees themselves are compensated "by their employers— the AFM and SAG-AFTRA." (*Id.*) Plaintiffs allege that by refusing to pay a large number of non-union members, the Trustees provide "an incentive to musicians to become Union members and stay members in order to receive the Royalties." (*Id.* ¶ 88.) Plaintiffs also allege that "key upper level employees of the Fund . . . only work half time for the Fund despite receiving salaries commensurate with full time work," and that they spend the remainder of their hours on Union work, implying that the Fund "subsidiz[es] the salaries of Union employees." (*Id.* ¶ 86.) By retaining royalties, the Trustees allegedly ensure the continued existence of the Fund and "funnel monetary benefits indirectly to the Unions," in breach of their duties of impartiality and loyalty. (*Id.* ¶ 88.)

Plaintiffs make additional allegations about how the Fund avoids paying artists in bad faith. They claim the Fund has contact information for thousands of non-featured performers on

9

the Unclaimed Royalties List, yet has declined to reach out to them to obtain payment information. (*Id*. ¶ 37.) Furthermore, the Fund's guidelines on its website purport to enforce time limits without any justification. (*Id*. ¶ 79.) Specifically, the guidelines indicate that unclaimed royalties "shall revert to the Fund" after six months, (*Id*. ¶ 77), and state that a "non-featured performer who has been omitted from the Fund's list of performers for a record shall have forty-five days from the publication on the Fund's website of the titles ready for distribution to make a claim to the Fund." (*Id*. ¶ 78.) While the Fund has "sole discretion" to remit royalties "after forty-five days but prior to disbursement," plaintiffs allege that even if the deadlines are not always enforced, they have a chilling effect because plaintiffs who read the guidelines may think that they cannot seek royalties if their claims are untimely. (*Id.* ¶¶ 78–79.) Plaintiffs allege that the guidelines are designed to deter artists from seeking royalties and to shift the burden of distribution to the artists. (*Id.* ¶ 79.)

As just one example, before filing this lawsuit, Mr. Blondell had not been compensated for playing the trombone in the song, "Wrong Way," recorded by the band Sublime in 1996, though the Fund allegedly could have discovered that Mr. Blondell performed on that track through "quick and minimal" online searches, or alternatively, by purchasing the CD, which "contained credits identifying the non-featured performers by name and role." (*Id.* ¶¶ 90–92.) Mr. Blondell was not listed on the Fund's Unclaimed Royalties List as of January 2016, indicating that the Fund had "failed to identify him as having performed 'Wrong Way,' as opposed to the Fund not possessing his necessary payment information." (*Id.* ¶ 90.) Mr. Blondell was not aware that the Fund existed until "after he retained counsel," "shortly before the filing of this lawsuit." (*Id.* ¶ 94.) After learning about the Fund, he did not submit a claim for royalties because both "the 45-day and six-month deadlines had passed by the time Mr.

Blondell became aware of the Royalties and the Fund," and thus, "he reasonably believed that the Fund would not pay him . . . based on the Guidelines." (*Id.* ¶ 94.) Mr. Blondell alleges that the Fund has now paid him $25,612.01, but that he is still owed royalties from the years 2000 through 2002, as well as 2004 and 2017. (*Id*. ¶ 95.) The second amended complaint describes similar allegations on behalf of the other named plaintiffs. (*See id*. ¶¶ 89–124.)

In light of the foregoing allegations, plaintiffs assert claims for: (1) breach of fiduciary duty, and (2) money had and received, alleging that the Trustees retain royalties belonging to plaintiffs in excess of $100 million. Plaintiffs seek damages, as well as equitable, declaratory, and injunctive relief requiring defendants to provide an accounting of royalties owed, and to adopt procedures to ensure unpaid artists are identified and royalties are paid in the future. (*Id*. at 66–67.) In the alternative, plaintiffs seek damages "in the amount of the undistributed royalties currently held in the Fund by the Trustees to be paid to a special master" for distribution to the putative class. (*Id*. ¶ 12.)

Defendants now move to dismiss the second amended complaint on the grounds that plaintiffs have failed to state claims upon which relief can be granted. Defendants argue that (1) plaintiffs' claims are moot; (2) defendants have not breached their fiduciary duties; (3) plaintiffs have failed to state a claim for money had and received; and (4) the CRB is the appropriate forum for this dispute.

Defendants assert that this case is moot because "Plaintiffs' claims for royalties ceased" when the Fund paid them. (Def. Mot. at 22.) They argue that plaintiffs will not be subject to any alleged wrongdoing in the future, as the Fund now has plaintiffs' payment information, and will pay them in the future if they are owed additional royalties. (*Id*. at 23.)

Further, defendants argue that plaintiffs fail to allege "the types of conduct necessary to show a breach" of fiduciary duty. (*Id*. at 10.) They note that plaintiffs themselves recognize the Fund's efforts in research and marketing in the second amended complaint. (*Id*. at 13, 15.) Rather than identify unreasonable choices made by the trustees, defendants assert that plaintiffs ask the Court to substitute the trustees' judgment for their own "ideal regime," and "adopt their wish list of extremely specific and burdensome preferred policies." (*Id*. at 12–13.) They also stress that the Trust Agreement demands that the trustees distribute royalties in an "economical" fashion. (*Id*. at 14.) With respect to plaintiffs' request for additional third-party arrangements, defendants argue that plaintiffs present "pie in the sky" ideas, demanding that defendants convince other parties in the music industry to transform their systems. (*Id*. at 15.) Defendants assert that "the Fund's failure to revolutionize the music industry's operations cannot possibly state a claim for breach of fiduciary duty." (*Id*. at 16.)

Defendants also contend that the second amended complaint is devoid of plausible allegations of bad faith, self-dealing, or a conflict of interest to support a claim for breach of the duty of loyalty. (*Id*. at 16.) They note that Congress intended for the Unions to participate in the appointment of the independent administrator, and argue that plaintiffs' claims about defendants' motives to benefit the Unions are "nothing more than speculative." (*Id*. at 18–19.)

Additionally, defendants assert that plaintiffs' claim for money had and received fails. "[N]o particular non-featured performer," defendants argue, "is legally entitled to royalties," as the Trustees have discretion to determine which recordings are eligible for royalties. (*Id*. at 19.) Moreover, defendants argue that the Fund does not benefit from its receipt of royalties as it merely passes the money along to non-featured performers, including plaintiffs. (*Id*. at 20.) Defendants contend that the cause of action for money had and received requires that the money

at issue was obtained "improperly," and that, on the contrary, defendants received the royalties through "completely legal appointment." (*Id*. at 21.)

Defendants also insist that plaintiffs should "ask the CRB to issue regulations regarding [the distribution] process," rather than demand judicial reform. (*Id*. at 7, 23.) They highlight that plaintiffs seek relief requiring "continuous judicial supervision" over "highly technical issues," and argue that the Court should decline to perform duties that Congress delegated to "expert judges" of the CRB. (*Id*. at 23–24 (internal quotation marks omitted).)

For the reasons set forth below, the Court finds that plaintiffs have plausibly alleged claims for breach of fiduciary duty, and money had and received. Accordingly, defendants' motion to dismiss is denied.

## STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) requires a court to evaluate the legal, rather than factual, sufficiency of a complaint. The Court construes the second amended complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). "To survive a motion to dismiss, a complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 80 (2d Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). Detailed facts are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citation omitted). The

determination of whether "a complaint states a plausible claim for relief" is "a context-specific task that requires" the court to "draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

## DISCUSSION

### I.     Mootness

To invoke the jurisdiction of a federal court, plaintiffs must have a "personal stake" in the action. *Klein ex. rel. Qlik Techs., Inc. v. Qlik Techs., Inc.*, 906 F.3d 215, 221 (2d Cir. 2018). A case becomes moot when "an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation after its initiation." *Id.* (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013)). A moot action is "no longer a 'Case' or 'Controversy' for purposes of Article III," and thus, is beyond the jurisdiction of federal courts. *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). Nevertheless, "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013).

Ordinarily, a class action becomes moot if no named class representative has a personal stake in the controversy at the time of class certification. *Sanchez-Gomez*, 138 S. Ct. at 1538. However, courts have created exceptions that allow class actions to proceed even when named plaintiffs' claims are no longer "live." *See e.g.*, *Gerstein v. Pugh*, 420 U.S. 103, 111 n.11 (1975) (discussing the "narrow class of cases in which the termination of a class representative's claim does not moot the claims of the unnamed members of the class").

As an initial matter, this case is not moot because the named plaintiffs contend that they have not been paid in full. (SAC ¶¶ 95, 100, 105, 111, 117, 123.) Even if defendants satisfy all

of the named plaintiffs' claims, exceptions to the mootness doctrine may apply. Relevant here is a substantive exception to the mootness doctrine for "inherently transitory" claims in the class action context. *Salazar v. King*, 822 F.3d 61, 73 (2d Cir. 2016). Even if the named plaintiffs' claims have been resolved before class certification, a case will not be moot if: "(1) it is uncertain that a claim will remain live for any individual who could be named as a plaintiff long enough for a court to certify the class; and (2) there will be a constant class of persons suffering the deprivation complained of in the complaint." *Id*. The Second Circuit has noted that the "inherently transitory" exception is not "limited" to cases in which "the fleeting nature of the conduct" gives rise to the claims. *Id*. at 74. In *Salazar*, for example, a putative class action against the U.S. Department of Education for failure to notify borrowers of their discharge rights was "inherently transitory," as the department "promptly" discharged the plaintiffs' loans as soon as plaintiffs "learn[ed] about the availability of debt relief" and applied for it. *Id*.

Additionally, courts have adopted a distinct exception to the mootness doctrine, allowing suits to survive even after named plaintiffs no longer have "a legally cognizable interest in the outcome," where plaintiffs sue in a representative capacity. *Muhammad v. City of New York Dep't of Corr.*, 126 F.3d 119, 123 (2d Cir. 1997) (citation omitted); *see Trachtman v. Anker*, 563 F.2d 512, 514 n.1 (2d Cir. 1977) (Where a plaintiff initiated a class action against his high school, but then graduated during the pendency of litigation, the suit could proceed, notwithstanding the absence of class certification, because he acted "in a representational capacity" as editor of a school publication, intending to vindicate the rights of those "similarly situated" with a "continuing stake" in the matter, and "a proper adversary relationship [existed] to assure proper presentation of the issues." (citations omitted)), *cert. denied*, 435 U.S. 925 (1978); *see also Klein*, 906 F.3d at 223–24 ("whether the interests of non-named parties are to be

15

considered in determining whether to dismiss a case as moot depends on whether those parties have a legal status separate from the interest asserted by the named plaintiff" (internal quotation marks omitted) (citation omitted)); *Brandon v. Bd. of Educ. of Guilderland Sch. Dist.*, 635 F.2d 971, 973 n.1 (2d Cir. 1980) (former students sued school in representative capacity, notwithstanding absence of any class certification (citing *Trachtman*, 563 F.2d at 514 n.1)), *cert. denied*, 454 U.S. 1123 (1981); *Kempner v. Town of Greenwich*, No. 3:06-CV-1393 (JCH), 2007 WL 2154178, at *3 (D. Conn. July 23, 2007).

Further, a defendant cannot "automatically moot a case simply by ending its unlawful conduct once sued." *Already, LLC*, 568 U.S. at 91; *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). A defendant claiming that his voluntary compliance moots a case "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 190 (citation omitted). A case is moot after a defendant voluntarily discontinues challenged conduct only if "(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Am. Freedom Def. Initiative v. Metro Transp. Auth.*, 815 F.3d 105, 109 (2d Cir. 2016) (quoting *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). Moreover, the Second Circuit has cautioned against permitting defendants to pay off named plaintiffs to moot a putative class action, particularly where plaintiffs seek injunctive relief. *See Radha Geismann, M.D., P.C. v. ZocDoc, Inc.*, 909 F.3d 534, 543 (2d Cir. 2018) (warning against "placing the defendant in control of a putative class action, effectively allowing the use of tactical procedural maneuvers to thwart class litigation at will" (citation omitted)).

Insofar as defendants claim that they have paid some or all of the named plaintiffs in full,

any of the enumerated exceptions could apply. Plaintiffs' claims may be "inherently transitory"; once a plaintiff files a lawsuit, the Fund will likely pay her promptly, and although she will no longer personally suffer an injury, there will be a "constant class of persons suffering the deprivation complained of," namely those artists who have not yet learned of the Fund's existence or their entitlement to royalties for any given performance. *Salazar*, 822 F.3d at 73; *see also Comer*, 37 F.3d at 797 (case was "acutely susceptible to mootness because of the fluid composition" of the class; "the harm remain[ed] constant," but "those who suffer[ed] from the harm often change[d] identity"). Plaintiffs might also be permitted to proceed in a representative capacity as they assert the interests of similarly situated artists. Further, defendants have not met their "formidable burden" to allow voluntary cessation of misconduct to moot a case; they have not rectified the alleged absence of any adequate system for the identification and payment of non-featured performers, let alone made it "absolutely clear" that the alleged breach of fiduciary duties has ceased. *Laidlaw*, 528 U.S. at 190. It cannot be said that they have "irrevocably eradicated the effects of the alleged violation," as plaintiffs allege that there are thousands of artists who remain unaware of their entitlement to royalties, or who are unclear on how to receive royalties they earned. *Davis*, 440 U.S. at 631. The Court declines to reward any effort by defendants to pay off named plaintiffs to avoid class litigation. Accordingly, defendants' motion to dismiss the case as moot is denied.

## II.     Plaintiffs' Failure to State Claims

### a.    Breach of Fiduciary Duty

A fiduciary is defined as "a person who is required to act for the benefit of another person on all matters within the scope of their relationship; one who owes to another the duties of good faith, trust, confidence, and candor." *United States v. Smith*, 985 F. Supp. 2d 547, 601 (S.D.N.Y.

2014) (internal quotation marks omitted) (citation omitted), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016); *see also DiTolla v. Doral Dental IPA of N.Y., LLC*, 100 A.D.3d 586, 587 (2012).  To state a claim for breach of fiduciary duty under New York law, a plaintiff must show:  (1) the existence of a fiduciary duty; (2) the defendant's breach of that duty; and (3) damages.  *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 114 (S.D.N.Y. 2009) (citing *Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1115 (2d Cir. 1986)); *see also Katzenberg v. Commercial Kitchen Designs, Inc.*, No. 09-CV-173 (ILG), 2011 WL 13299959, at *4 (E.D.N.Y. Sept. 6, 2011).  Defendants do not contest that plaintiffs have adequately alleged the existence of a fiduciary relationship, or that defendants owe plaintiffs fiduciary duties as trustees of the Fund. The Court must still assess whether plaintiffs plausibly allege a breach of those duties that caused plaintiffs harm.

### i.  Duty of Prudence

It is well-established that fiduciaries have a duty to use the prudence and diligence that "prudent men of discretion and intelligence" would "employ in their own like affairs."  *LNC Investments, Inc. v. First Fid. Bank*, No. 92-CV-7584 (MBM), 1997 WL 528283, at *17 (S.D.N.Y. Aug. 27, 1997) (quoting *In re Clark's Will*, 257 N.Y. 132, 136 (1931)); *see also Dresner Co. Profit Sharing Plan v. First Fid. Bank, N.A., N.J.*, No. 95-CV-1924 (MBM), 1996 WL 694345, at *3 (S.D.N.Y. Dec. 4, 1996) ("In New York, the fiduciary duties of a trustee are governed" by a "prudent person standard." (citing *In re Bank of New York*, 35 N.Y.2d 512, 518 (1974)).  While a trustee's duties may be modified by the terms of a trust, the common law duty of prudence is a minimum standard that no agreement can override.  An agreement granting fiduciaries "broad discretion" will not relieve them of their duty "to act reasonably and in good faith."  *In re Estate of Wallens*, 9 N.Y.3d 117, 123 (2007).  Nonetheless, a fiduciary is not liable

for a "mere error in judgment," as long as the choice was prudent and "the result of careful and informed deliberation," given the facts "as they existed at the time the trustee acted." *LNC Investments, Inc.*, 1997 WL 528283, at \*17 (internal quotation marks omitted) (citation omitted); *see also Stark v. United States Tr. Co. of N.Y.*, 445 F. Supp. 670, 678–79 (S.D.N.Y. 1978) (A trustee's "performance must be judged not by hindsight but by facts which existed at the time of the occurrence.").

Here, plaintiffs plausibly allege that defendants breached their fiduciary duties by failing to take steps that prudent trustees would in pursuing the singular goal of the Fund – to compensate non-featured performers. (*See* Trust Agreement art. II, § 2.) The extent to which fiduciaries breached their duties "are questions of fact that should not be resolved on a motion to dismiss." *Grund v. Del. Charter Guarantee & Tr. Co.*, 788 F. Supp. 2d 226, 249 (S.D.N.Y. 2011), *on recons.*, No. 09-CV-8025, 2011 WL 3837146 (S.D.N.Y. Aug. 30, 2011); *see also Musalli Factory for Gold & Jewellry v. JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 26 (S.D.N.Y. 2009) ("New York courts generally avoid dismissing a claim of breach of fiduciary duty under Rule 12(b)(6) because it usually involves a question of fact . . . ."), *aff'd sub nom.* 382 F. App'x 107 (2d Cir. 2010); *Dresner*, 1996 WL 694345, at \*7 ("[W]hether the trustees here committed a mere error in judgment cannot be decided merely on the pleadings. The issue of prudence, here, presents a question of fact."). Without opining on the extent of any potential breach, at this stage of the litigation, the Court finds that plaintiffs have sufficiently stated a claim for breach of fiduciary duty by alleging that defendants' actions do not reflect those of prudent trustees.

It is plausible that defendants' failure to hire a marketing manager until 2016, and their unwillingness to commit a greater percentage of receipts to advertising, was unreasonable given

the lack of awareness about the Fund and the fact that increase in awareness would "drastically decrease" the amount of research required.  (SAC ¶ 44.)  The fact that the Trustees allegedly have contact information for thousands of artists, and yet have declined to reach out to them to obtain payment information, (*id*. ¶ 37), evidences a lack of diligence that "a prudent person would use in the exercise of his own affairs."  *Dresner*, 1996 WL 694345, at *3.  Similarly, defendants offer no explanation for their failure to use their subscription to Lexis Accurint more frequently, as doing so, according to plaintiffs, would apparently lead to thousands of royalty payments.  (SAC ¶ 38.)  The Court recognizes that the Trustees make judgment calls on the efficacy of actions taken on behalf of the trust; they must balance competing interests and bear in mind that any increase in expenses "necessarily *reduces* the money available to pay non-featured performers."  (Def. Mot. at 14 (emphasis in original).)  Nevertheless, for purposes of this motion, plaintiffs adequately allege that defendants have failed to take certain actions that a prudent fiduciary would undertake in pursuit of the goal of the Fund.

Defendants contend that plaintiffs seek to interfere with their discretion, endeavoring to impose a higher standard of care by requiring them to adopt "preferred policies," rather than any prudent course of action, as required by law.  (*Id*. at 23.)  While the second amended complaint may be read as plaintiffs' championing a preferred course of action, this does not negate the existence of well-pled allegations that defendants failed to adhere to the duty of prudence. Defendants direct the Court to statements in their self-drafted guidelines and website as evidence of their diligence.  For example, they highlight how the Fund's website states:  "[t]he Fund staff conducts extensive research" including "examining . . . documentation . . . such as liner notes and websites to identify non-featured performers."  (Def. Mot. at 13.)  However, these materials are outside the four corners of the pleading, and the Court cannot take judicial notice of them to

establish the truth of defendants' contentions. *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (On a motion to dismiss, the court may only take judicial notice "to establish the existence of" a document, "not for the truth of the facts asserted" therein. (citations omitted)).

Moreover, while the Trust Agreement grants the Trustees discretion with regard to the *method* of distribution, the ultimate objective of the Fund – to pay royalties to non-featured performers – is not discretionary. (*See* Trust Agreement art. II, § 2 (setting out the purpose of the Fund).) *See Wallens*, 9 N.Y.3d at 122 ("To determine whether a trustee's distribution of trust assets was proper, the settlor's intent controls." (citation omitted)); *In re Van Zandt's Will*, 231 A.D. 381, 384 (4th Dep't 1931) (Even "[w]here a trustee has been given freedom to act according to his own judgment," he "may be compelled to do that which the trust fairly requires him to do." (citations omitted)). The Trustees do not appear to have the discretion to refrain from paying thousands of eligible artists. *See Magavern v. United States*, 415 F. Supp. 217, 220 (W.D.N.Y. 1976) (While the will at issue did not require the trustees to "give equal allotments to each beneficiary," the trustee was "bound to distribute some trust income" to each beneficiary, as "[n]othing in the will allow[ed] the trustee to delete the beneficiary totally."), *aff'd*, 550 F.2d 797 (2d Cir. 1977). "[E]ven if the trustee is granted discretion over the amount of trust income to be distributed to individual trust beneficiaries . . . as long as the trustee is directed to pay some trust income" to them, an individual beneficiary "can compel the trustee to exercise his discretion reasonably." *Id*. at 221. Accordingly, while the Court recognizes the difficult nature of the Fund's task, defendants cannot rely on any grant of discretion to justify the unavoidable fact that tens of thousands of eligible artists have not been paid, or to negate plaintiffs' allegations that their conduct fell below the standard of a prudent trustee. Where a document grants trustees

"absolute discretion" and "latitude to withhold or pay out income," "the words 'absolute discretion' do not insulate the trustees . . . from liability," or absolve them of their duty to make reasonable choices. *In re JP Morgan Chase Bank, N.A.*, 38 Misc. 3d 363, 377 (Sur. N.Y. Cty. 2012). Plaintiffs have plausibly alleged that defendants failed to exhibit a reasonable degree of prudence and diligence in their efforts to pay non-featured performers, and resolution of these issues are highly fact-driven. As such, they have stated a valid claim.

### ii. Duties of Loyalty and Impartiality

"[I]t is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect." *Khaldei v. Kaspiev*, 135 F. Supp. 3d 70, 83 (S.D.N.Y. 2015) (quoting *Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466 (1989)); *see also Wallens*, 9 N.Y.3d at 122; *In re Heller*, 6 N.Y.3d 649, 655 (2006); *Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928). The duty of loyalty precludes "not only blatant self-dealing, but also requir[es] avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." *Khaldei*, 135 F. Supp. 3d at 83 (quoting *Birnbaum*, N.Y.2d at 466). Accordingly, in the context of a trust, a trustee has a duty "to administer the trust solely in the interest of the beneficiary." *Wallens*, 9 N.Y.3d at 122 (citations omitted); *see also Renz v. Beeman*, 589 F.2d 735, 748 (2d Cir. 1978) ("The duty of a trustee is . . . absolute. The rule is inflexible that a trustee shall not place himself in a position where his interest is or may be in conflict with his duty." (internal quotation marks omitted) (citation omitted)), *cert. denied*, 444 U.S. 834 (1979). Implicit in the "undivided" duty of loyalty is that a trustee must treat beneficiaries equally, at least when the trust agreement does not authorize partiality. *See Renz*, 589 F.2d at 748 (An "independent trustee" is "permitted to favor neither side."); *Withers v. Teachers' Ret. Sys. of City of New York*, 447 F. Supp. 1248, 1257 (S.D.N.Y. 1978) ("New York

law imposes an obligation on trustees to accord impartial treatment to beneficiaries." (citations omitted)), *aff'd sub nom.* 595 F.2d 1210 (2d Cir. 1979); *see also Zim Israel Navigation Co., Ltd v. 3-D Imports, Inc.*, 29 F. Supp. 2d 186, 192 (S.D.N.Y. 1998).

Moreover, a grant of discretion will never absolve a trustee of his "unwavering duty of complete loyalty to the beneficiaries of the trust no matter how broad the settlor's directions allow the trustee free rein to deal with the trust." *Boles v. Lanham*, 55 A.D.3d 647, 648 (2d Dep't 2008); *see also Wallens*, 9 N.Y.3d at 123 ("But even when the trust instrument vests the trustee with broad discretion to make decisions regarding the distribution of trust funds, a trustee is still required to act reasonably and in good faith . . . ."); *In re Mankin*, 88 A.D.3d 717, 719 (2d Dep't 2011). As Judge Cardozo once stated, "[a] trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Meinhard*, 249 N.Y. at 464.

Here, plaintiffs state a claim for breach of the duty of loyalty and impartiality by plausibly alleging that the relationship between defendants and the Unions creates a potential conflict of interest. Congress intended for an "independent administrator" to control distribution of royalties to non-featured performers. *See* 17 U.S.C. § 114(g)(2)(B), (C). However, while Section 114 requires the Unions to play a role in appointing the trustees, and while some trustees are Union members, plaintiffs do not rely on this alone to raise a conflict. Rather, the alleged conflict is based on the Trustees' *employment* by the Unions, as the Trustees allegedly act in ways to benefit "their employers" – the Unions – at the expense of certain beneficiaries. (*See* SAC ¶¶ 84–88.) Plaintiffs put forth several plausible allegations that defendants do not act with complete loyalty to the interests of all beneficiaries. The Trustees' alleged failure to partner with any entity, except the Unions, for systematic collection of information, (*id.* ¶¶ 64, 65, 71), and

the fact that the Fund has "a vastly greater success rate" at paying Union artists, (*id.* ¶¶ 24, 88), both suggest at least a potential conflict of interest, in that the Fund may prioritize the Unions' interests over those of non-union artists eligible for royalties. *See Marcus v. Quattrocchi*, No. 08-CV-9514 (VB), 2014 WL 521340, at *8 (S.D.N.Y. Feb. 4, 2014) ("New York courts have found breach of [the duty of loyalty] . . . when the trustee, by representing antagonistic interests, is placed under temptation to make decisions which favor a third person who is competing with the beneficiary." (internal quotation marks omitted) (citation omitted)); *Birnbaum*, 73 N.Y.2d at 466 (When a fiduciary, "who is bound to single-mindedly pursue the interests of those to whom a duty of loyalty is owed, deals with a person in [] close relation" to him, "possible advantage" to the other person "might consciously or unconsciously influence the fiduciary's judgment." (internal quotation marks omitted) (citation omitted)).

Construing all inferences in plaintiffs' favor, it is plausible that defendants, who are allegedly paid by the Unions, aim to incentivize artists to join the Unions by not paying as many non-union artists. (SAC ¶ 88.) A trustee breaches his duty of loyalty if he acts to benefit a third-person rather than the trust. Plaintiffs have alleged that when defendants do not pay non-union artists, the Unions obtain a benefit, and consequently, defendants obtain a benefit, at the expense of certain beneficiaries; if this is true, defendants may be in breach of the duty of loyalty.

### iii.    Causation & Damages

Plaintiffs have adequately pled that defendants' breach of fiduciary duty caused plaintiffs to incur damages. By depriving them of royalties they earned, defendants cause plaintiffs to suffer losses. In the context of breach of fiduciary duty, "[a]ny doubt or ambiguity alleged by the Defendants with respect to the Plaintiffs' causation or damages should be construed in favor of the Plaintiffs . . . ." *Brown Media Corp. v. K & L Gates, LLP*, 586 B.R. 508, 529 (E.D.N.Y.

2018) (citing *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994)

(collecting cases) ("[B]reaches of a fiduciary relationship in any context comprise a special breed

of cases that often loosen normally stringent requirements of causation and damages.")).

Accordingly, defendants' motion to dismiss plaintiffs' claims for breach of fiduciary duty is

denied.

### b. Money Had and Received

To state a claim for money had and received under New York law, a plaintiff must show:

(1) the defendant received money belonging to the plaintiff; (2) the defendant received a benefit

from the receipt of the money; and (3) under principles of equity and good conscience, the

defendant should not be permitted to keep the money. *See Aaron Ferer & Sons Ltd. v. Chase

Manhattan Bank, N.A.*, 731 F.2d 112, 125 (2d Cir. 1984) (citing *Miller v. Schloss*, 218 N.Y. 400,

407 (1916)). "The action depends upon equitable principles in the sense that broad

considerations of right, justice and morality apply to it, but it has long been considered an action

at law." *Parsa v. State*, 64 N.Y.2d 143, 148 (1984) (citation omitted); *see also Wood v. Inc. Vill.

of Patchogue of N.Y.*, 311 F. Supp. 2d 344, 361 (E.D.N.Y. 2004). Money had and received

claims are similar to those for unjust enrichment, as both are "premised on the principle that

recovery is to be had according to what is equitable and good," and plaintiffs may recover

damages "necessary to make the plaintiff whole." *In re Allou Distribs., Inc.*, 446 B.R. 32, 77

(Bankr. E.D.N.Y. 2011) (internal quotation marks omitted) (citations omitted); *see also Belda v.

Doerfler*, No. 14-CV-941 (AJN), 2015 WL 5737320, at *4 n.4 (S.D.N.Y. Sept. 30, 2015) (The

cause of action for money had and received is "essentially identical to a claim of unjust

enrichment." (collecting cases)); *Bd. of Educ. of Cold Spring Harbor Cent. Sch. Dist. v.

Rettaliata*, 78 N.Y.2d 128, 140 (1991).

With respect to the first element, plaintiffs have sufficiently alleged that defendants received money belonging to plaintiffs. Trustees are regarded as the "legal owners" of a trust, and thus, it is plausible that defendants would have "received" the royalties at issue. *Berkshire Settlements v. Ashkenazi*, No. 09-CV-0006 (FB) (JO), 2012 WL 4928845, at *4 (E.D.N.Y. Aug. 23, 2012), *report and recommendation adopted sub nom. Berkshire Settlements v. Ashkenazi*, 2012 WL 4928864 (E.D.N.Y. Oct. 16, 2012) (internal quotation marks omitted) (citation omitted). For money to "belong" to plaintiffs, they must allege a "possessory interest in the funds." *Grain Traders, Inc. v. Citibank, N.A.*, 960 F. Supp. 784, 793 (S.D.N.Y. 1997), *aff'd*, 160 F.3d 97 (2d Cir. 1998); *see also Kohler v. Errico*, No. 3:09-CV-7290 (WWE), 2011 WL 1077722, at *9 (S.D.N.Y. Feb. 23, 2011) ("Plaintiff must allege an ownership interest or superior title to defendant" to assert a claim for money had and received. (citation omitted)). Where a trustee is directed to distribute at least "some trust income," a beneficiary "can compel the trustee to exercise his discretion reasonably," and "[t]o that extent, the beneficiary has a right to property under New York law." *Magavern*, 415 F. Supp. at 221 (internal quotation marks omitted). To the extent that plaintiffs are entitled to royalties, they have a possessory interest in a percentage of Fund receipts, as provided by Section 114. *See e.g.*, 17 U.S.C. § 114(g)(2)(B) ("2 ½ percent of the receipts shall be . . . distributed to nonfeatured musicians (whether or not members of the American Federation of Musicians) who have performed on sound recordings."); *see also Risto v. Screen Actors Guild – Am. Fed'n of Television and Radio Artists et al.*, No. 2:18-CV-07241 (CAS) (PLA), 2018 WL 7016345, at *9 (C.D. Cal. Nov. 6, 2018) (In a different case involving defendants, non-featured performers plausibly alleged a property interest in a percentage of Fund receipts under Section 114.); *Rettaliata*, 78 N.Y.2d. at 139 (where town held funds in trust for schools, funds were regarded as "belonging" to schools).

While Section 114 grants defendants discretion to determine eligibility, and the right to deduct "reasonable costs" for the administration of the Fund, 17 U.S.C. § 114(g)(3), the statute does not afford defendants free rein over receipts. On the contrary, defendants are "considerably restricted" in their disposition of the property, as Section 114 "states with particularized precision" the percentage of receipts to be allocated for artists and mandates that the funds be deposited in an escrow account. *Risto*, 2018 WL 7016345, at *9; *see* 17 U.S.C. § 114(g)(B), (C). As plaintiffs have adequately alleged they have a possessory interest in royalties, they have satisfied the first element of a claim for money had and received.

As for the second element, for the reasons explained, *supra*, plaintiffs have plausibly alleged that defendants benefit from their retention of royalties in excess of $100 million. (SAC ¶ 146.) By holding on to royalties, rather than paying them out to plaintiffs, defendants ensure the continued operations of the Fund, which benefits the Unions, as it benefits their members and allegedly "allow[s] the subsidization of the work performed for the Unions by the employees of the Fund." (*Id.*) While defendants contend that plaintiffs "entirely fail to tie" them to any alleged benefits, (Def. Mot. at 20.), the Trustees are officers, members, and employees of the Unions, and they are allegedly paid by the Unions; drawing all inferences in plaintiffs' favor, it is plausible that the strengthening of the Unions strengthens defendants in their official capacities.

Defendants rely on *United Republic Insurance Co. v. Chase Manhattan Bank*, (Def. Mot. at 20), to contend that they do not receive a benefit, as they merely "pass[] the money through" to others. 168 F. Supp. 2d 8, 20 (N.D.N.Y. 2001), *aff'd*, 40 F. App'x 630 (2d Cir. 2002), *mandate recalled*, *order vacated sub nom. United Republic Ins. Co., in Receivership v. Chase Manhattan Bank*, 315 F.3d 168 (2d Cir. 2003). However, that case is distinguishable in

that the plaintiff's claim was dismissed, in part, because the plaintiff "freely gave away" money as a loan, and thus, could not later claim a possessory interest. *Id*. at 19.

Finally, the third element does not preclude plaintiffs' claim for money had and received. While questions of fact remain, at this stage of the proceeding, plaintiffs have plausibly alleged that equity requires defendants to distribute the royalties belonging to plaintiffs, as they have not made a reasonable, good faith effort to do so. (SAC ¶ 147.) As defendants note, the "traditional" case may include "oppression," "extortion," or "deceit," *Fischer v. Graham*, No. 15-CV-6414 (NSR), 2016 WL 3181157, at *4 (S.D.N.Y. June 3, 2016) (citations omitted); however, plaintiffs are not required to allege that money was obtained in an improper manner to sustain a claim for money had and received. *See e.g.*, *Simonds v. Simonds*, 45 N.Y.2d 233, 242 (1978) ("Unjust enrichment . . . does not require the performance of any wrongful act by the one enriched." (citations omitted)); *Litvinoff v. Wright*, 150 A.D.3d 714, 716 (2d Dep't 2017) ("Contrary to the defendant's contention, a plaintiff need not allege malice to state a cause of action for money had and received." (collecting cases)); *Vill. of Elmira Heights v. Town of Horseheads*, 234 A.D. 270, 273 (3d Dep't 1931) (plaintiff stated a claim for money had and received where defendant received money through error), *aff'd*, 260 N.Y. 507 (1932).

Defendants' belief that they are impervious to an action for money had and received because they received the funds by "legal appointment" is incorrect. (Def. Mot. at 21.) Courts permit plaintiffs to recover money "which defendant received 'impressed with a species of trust' because 'it is against good conscience for the defendant to keep the money.'" *Kohler*, 2011 WL 1077722, at *9 (quoting *Rettaliata*, 78 N.Y.2d at 138 (internal quotation marks omitted) (citations omitted)). In *Rettaliata*, for example, the New York Court of Appeals found that a school district could challenge the disbursement of tax dollars by town officials, where officials

held the tax revenue "in trust for the school districts," and then failed to distribute the money. 78 N.Y.2d at 139. The Court found that the "principles of equity and considerations of justice apply no less in cases" where a municipality, which came into the money lawfully, withholds that money "it was obligated [by statute] to pay over to another." *Id*. at 138. Similarly here, plaintiffs have plausibly alleged that defendants are holding money, which they came into lawfully, but which equity requires them to remit to plaintiffs.

Accordingly, as plaintiffs have adequately pled all three elements of a claim for money had and received, defendants' motion to dismiss that claim is denied.

### III. The CRB

Defendants stress that plaintiffs' requested relief will require "continuous judicial supervision." (Def. Mot. at 23 (citation omitted).) They caution the Court against overseeing the "day-to-day management of the Fund," and argue that the CRB is the appropriate forum for such "highly technical issues." (*Id*. at 23 (citation omitted).) Defendants suggest that plaintiffs "ask the CRB to issue regulations," rather than seek judicial reform. (*Id*. at 7.)

As an initial matter, defendants do not appear to argue that plaintiffs failed to exhaust available remedies; they simply state that the CRB is a preferable forum. (Def. Reply (Doc. No. 55) at 10.) At the same time, the parties agree that only copyright owners or users of copyrighted works may initiate CRB proceedings, and that the CRB has not enacted any regulations governing the distribution of royalties to non-featured performers. (Def. Mot. at 4; Def. Reply at 10; Pl. Opp'n (Doc. No. 53) at 24.) While plaintiffs may petition to participate in CRB proceedings, the CRB has no authority to resolve claims for breach of fiduciary duty, and money had and received, nor does it have authority to remedy past wrongs. Thus, defendants' argument that the CRB is the proper forum is without merit.

With respect to plaintiffs' request for an injunction, it remains to be seen whether that remedy would require taxing, ongoing supervision. Most importantly, however, a plaintiff's request for improper relief does not provide a basis for dismissal. *See Norwalk CORE v. Norwalk Redevelopment Agency*, 395 F.2d 920, 925–26 (2d Cir. 1968) ("[I]f the complaint was dismissed on the basis that the relief requested was inappropriate, or beyond the Court's power to grant, the Court moved too quickly." "[A] complaint should not be dismissed for legal insufficiency except where there is a failure to state a claim on which some relief, not limited by the request in the complaint, can be granted."); *City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296, 353 (E.D.N.Y. 2007) ("[A] motion for failure to state a claim properly addresses the cause of action alleged, not the remedy sought."). As defendants fail to articulate any theory that might preclude plaintiffs from having their day in court, they fail to eviscerate the plausible allegations of misconduct in the second amended complaint.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss (Doc. No. 52) is denied. Plaintiffs may pursue their claims for breach of fiduciary duty, and money had and received. This case is recommitted to Magistrate Judge Levy for supervision of all pre-trial matters.

SO ORDERED.

Dated:   Brooklyn, New York
      March 29, 2019

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge